# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00395-CV

**Alexander Austin Sheshunoff, Appellant**

**v.**

**Gabrielle Martha Sheshunoff, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. FM302436, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

The principal issue in this case concerns the enforceability of a marital property agreement. *See* Tex. Fam. Code Ann. § 4.105 (West 1998). Applying section 4.105 to the defensive theories that were timely raised in this case, we affirm the district court's judgment enforcing the agreement.

## BACKGROUND

**The Marital Property Agreement**

Appellant Alexander Sheshunoff and Appellee Gabrielle Sheshunoff were married in 1971. Before their marriage, the couple entered into an agreement governing various rights and

obligations relating to their marital property, and they devised a new one in 1990. Beginning in 2002, the couple, each with assistance of several attorneys, accountants, and other professional advisors, began negotiating an elaborate thirty-seven page Marital Property Agreement that addressed the couple's respective rights to their substantial marital assets. They eventually executed the Agreement in February 2003. In April 2003, Ms. Sheshunoff filed for divorce and sought the benefit of the agreed-upon property division.

The circumstances surrounding the formation of the Agreement are at the root of the present controversy. According to Mr. Sheshunoff, the Agreement shifted large amounts of the couple's marital assets to Ms. Sheshunoff and large amounts of marital liabilities to him so as to leave her with a net worth of $48 million and him with a net worth of negative $12 million. Mr. Sheshunoff asserts that, throughout the negotiations, he had understood and intended that this arrangement was solely to achieve tax and estate planning benefits and that neither party had any intention to actually divorce. In an affidavit he filed in the district court, he explains that the parties intended for Ms. Sheshunoff, a Canadian citizen, to expatriate their assets to Canada following the adoption of the Agreement and ultimately patriate the assets in a jurisdiction that would not impose estate or inheritance taxes. Mr. Sheshunoff claims that Ms. Sheshunoff and her lawyers misled him to believe that she shared this intent when, in fact, she was plotting to file for divorce (and avail herself of the highly favorable property division) once she persuaded him to sign the agreement. Ms. Sheshunoff denies these allegations.

**Proceedings in the district court**

On July 1, 2003, Ms. Sheshunoff filed a no-evidence motion for partial summary judgment to "declare the February 8, 2003, 'Marital Property Agreement' executed by and between

the parties fully enforceable." On July 15, Mr. Sheshunoff filed an answer[1] containing a general denial and the affirmative defenses that (1) "ALEXANDER AUSTIN SHESHUNOFF did not sign the agreement voluntarily but under duress and fraud," and (2) "[t]he agreement was unconscionable when it was signed" because Ms. Sheshunoff's financial obligations were not disclosed and because he was not aware that Ms. Sheshunoff intended to file for divorce when he signed the Agreement.[2] As we discuss in detail below, involuntary execution and unconscionability (coupled with inadequate disclosure of marital property information) are the only two defenses to marital property agreements that are specified in the family code. *See* Tex. Fam. Code Ann. § 4.105(a)(1), (2). On July 23, Mr. Sheshunoff filed a response to Ms. Sheshunoff's partial summary-judgment motion. Among other grounds for denial, he asserted (1) involuntary execution of the Marital Property Agreement; and (2) unconscionability and lack of disclosure. *See id.* With regard to his involuntary execution defense, he claimed to offer "evidence that created a genuine issue of material fact that his consent to the Agreement was not voluntary, because it was obtained by conduct that amounted to fraud and duress."

---

[1] The July 15 filing was Mr. Sheshunoff's first amended answer. His original answer is not in the record. His summary judgment response represents that he filed a *pro se* answer on May 9.

[2] Mr. Sheshunoff also asserted, as an affirmative defense, "The document is not an agreement contemplated by either Article XVI, Section 15 of the Texas Constitution or TX Family Code, Subchapter B (§ 4.101 et al) but is an estate and tax planning device." To the extent this defense is distinct from his contentions regarding involuntary execution and fraud, he does not assert it on appeal.

On September 29, the district court granted Ms. Sheshunoff's motion for partial summary judgment without specifying the grounds.[3] Several months later, in late spring of 2004,[4] Mr. Sheshunoff amended his answer to raise several new affirmative defenses against the enforcement of the Marital Property Agreement and, for the first time, asserted counterclaims. He then filed a jury demand. As further amended, his pleadings ultimately stated the following affirmative defenses, in addition to his original defenses:

- want of consideration;

- breach of fiduciary duty, by inducing Mr. Sheshunoff into the Marital Property Agreement "under false pretenses";

- fraudulent inducement into the Marital Property Agreement through misrepresentations regarding a claimed collateral agreement to convey the "Maine Property" (as defined in the Agreement) into trust for the benefit of their children;

- fraudulent inducement into the Marital Property Agreement through misrepresentations regarding a claimed collateral agreement that the Magnolia Property and Arcade Land Management Company would be Mr. Sheshunoff's separate property and would be available as a source of payments on the Draw Note (all also as defined in the Agreement);

---

[3] However, the district court initially announced its intent to grant the motion in a letter explaining that "the cases do not support a contention that fraud is sufficient to support a finding of involuntariness" under section 4.105 of the family code. The court added that "even if fraud is sufficient, failure of a party to disclose that s/he is contemplating divorce does not constitute fraud in the inducement of a marital agreement, at least under the facts and circumstances of this case." "Finally," the court stated, "I do not believe that a trier of fact, after hearing evidence in this case, could correctly conclude that Mr. Sheshunoff signed the marital agreement involuntarily."

[4] The parties assert that Mr. Sheshunoff filed his second amended answer and original counter-claim on April 30. The record does not contain this document, but only his fourth amended answer and counter-claim, filed May 25.

4

- fraudulent inducement into the Marital Property Agreement through misrepresentations that the Agreement was intended solely to be an estate-planning and tax-planning device;

- section 4.105 of the family code, by barring all defenses to the enforcement of the Marital Property Agreement not enumerated in that provision, violates Texas and federal constitutional protections including due process and due course of law, separate and community property, and impairment of obligations of contracts.

Mr. Sheshunoff asserted the following counterclaims:

- divorce;

- reformation, specific performance, breach of contract damages, or rescission with regard to the Maine Property;

- reformation, specific performance, breach of contract damages, or rescission with regard to the Magnolia Property and the Arcade Land Management Company;

- damages for fraudulent inducement related to an alleged representation that the Marital Property Agreement was intended solely to be an estate and tax-planning device;

- damages for breach of fiduciary duty related to an alleged representation that the Marital Property Agreement was intended solely to be an estate and tax-planning device;

- damages for fraudulent inducement regarding the Maine Property;

- damages for fraudulent inducement regarding the Magnolia Property and Arcade Land Management Company.

On May 4, 2004, Ms. Sheshunoff filed a traditional motion for summary judgment claiming that the Agreement left no community estate to be divided and that the court should render judgment in accordance with that property division. She also filed a motion to strike Alexander

5

Sheshunoff's new defenses and counterclaims, as well as a motion to compel arbitration and to sever with regard to his counterclaims for reformation or modification concerning the Maine Property and the Magnolia Property and Arcade Land Management Company. The latter motion was based on sections 15.9 and 15.10 of the Marital Property Agreement, which required that "any dispute relating to this Agreement" be mediated or, "if the parties cannot agree on a mediator, to binding arbitration."

The district court struck all of Alexander Sheshunoff's new defenses and all of his counterclaims except those seeking reformation of the Agreement in relation to the Maine Property and the Magnolia Property and Arcade Land Management Company, which it ordered to arbitration.[5] In its order, the court also made explicit findings that (1) the prior partial summary judgment included the determination that the Marital Property Agreement was fully enforceable and barred all defenses to enforcement; (2) all of Alexander Sheshunoff's counterclaims (other than those relating to the Maine Property and the Magnolia Property and Arcade Land Management Company seeking reformation or modification of the Marital Property Agreement) were precluded by the prior partial summary judgment and were not timely pled; (3) the remaining counterclaims related to disputes and disagreements regarding the Marital Property Agreement, and should thus be severed and referred to arbitration as provided in the Agreement; and that (4) the requirement to mediate disputes relating to the Marital Property Agreement "has elapsed, is futile and would create unnecessary delay and cause the parties to incur unnecessary expense." The district court subsequently granted final summary judgment and a final decree of divorce incorporating its prior rulings that the Marital

---

[5] The district court also denied a motion for sanctions filed by Ms. Sheshunoff.

Property Agreement was fully enforceable and dividing the property in accordance with the Agreement.  This appeal followed.

## DISCUSSION

Mr. Sheshunoff brings five issues on appeal.  First, he contends that the district court erred in granting its partial summary judgment foreclosing his involuntariness defense; he does not complain of the court's ruling regarding unconscionability and lack of disclosure.  In his second issue, Mr. Sheshunoff argues that the district court abused its discretion in striking his amended pleadings.  In his third issue, Mr. Sheshunoff asserts that the district court erred in severing and referring his reformation claims to arbitration because Ms. Sheshunoff had waived her right to seek arbitration and had failed to exhaust her remedy of mediation as a precedent to arbitration.  In his fourth issue, Mr. Sheshunoff complains that the district court erred in striking his jury demand, while in his fifth issue he contends that the district court erred in granting final summary judgment because he had raised genuine issues of material fact regarding his stricken pleadings and severed claims.[6]

### Partial summary judgment

In his first issue, Mr. Sheshunoff challenges the district court's granting of partial summary judgment foreclosing his involuntary-execution defense to the Marital Property Agreement. Specifically, he argues that (1) he has raised a fact issue with regard to the common-law defenses

---

[6] After this case was submitted, Ms. Sheshunoff filed a motion to dismiss predicated on events during an arbitration proceeding that the parties conducted after oral argument.  In light of our disposition of the merits, we dismiss the motion as moot.

of fraudulent inducement and duress; and (2) this evidence also raises a fact issue regarding involuntary execution under section 4.05 of the family code.

### *Standard of review*

The district court granted partial summary judgment on a "no evidence" motion filed by Ms. Sheshunoff. *See* Tex. R. Civ. Pro. 166a(i). A no-evidence summary judgment is essentially a pretrial directed verdict; thus, we apply the same legal sufficiency standard in reviewing the no-evidence summary judgment as we apply in reviewing a directed verdict. *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70 (Tex. App.—Austin 1998, no pet.). We view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). If more than a scintilla of evidence exists, it is legally sufficient. *Goodman*, 80 S.W.3d at 577; *Cantu v. Texas Workforce Comm'n*, 145 S.W.3d 236, 239 (Tex. App.—Austin 2004, no pet.). A no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). Because the trial court's order does not specify the grounds for granting summary judgment, we must affirm the summary judgment if any of the theories presented

8

to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217 (Tex. 2004).

We must construe section 4.105 of the family code to address Mr. Sheshunoff's claims on appeal. Statutory construction is a question of law we review *de novo. Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). When construing a Texas statute, our paramount task is to ascertain the legislature's intent in enacting that provision. *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004). We first look to the plain and common meaning of the words the legislature used. Tex. Gov't Code Ann. § 311.011 (West 2005); *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000); *Texas Workers' Comp. Comm'n v. Texas Builders Ins. Co.*, 994 S.W.2d 902, 908 (Tex. App.—Austin 1999, pet. denied). "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code Ann. § 311.011(b). We are to presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect. *Cities of Austin, Dallas, Fort Worth and Hereford v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002); *see State v. Evangelical Lutheran Good Samaritan Soc'y*, 981 S.W.2d 509, 511 (Tex. App.—Austin 1998, no pet.). In ascertaining legislative intent, we may also consider the evil sought to be remedied, the legislative history, and the consequences of a particular construction. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). We must also consider, among other things, statutory provisions on the same or similar subjects. Tex. Gov't Code Ann. § 312.008 (West 2005). "When the same or a similar term is used in the same connection in different statutes, the term will be given the same meaning in one as in the

9

other, unless there is something to indicate that a different meaning was intended." *Guthery v. Taylor*, 112 S.W.3d 715, 722 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Additionally, we are authorized to consider the "object sought to be attained" by the legislature when enacting the provision. Tex. Gov't Code Ann. § 311.023 (West 2005); *see also In re Bell*, 91 S.W.3d 784, 787 (Tex. 2002) ("[The Act] makes clear that courts may consider the 'legislative history' and the 'object sought to be attained' in construing statutes."). A related concept is that we are to construe a uniform act adopted by the Texas Legislature "to effect its general purpose to make uniform the law of those states that enact it." Tex. Gov't Code Ann. § 311.028 (West 2005).

### *The involuntary execution defense*

Our disposition of Mr. Sheshunoff's first issue requires us to evaluate Mr. Sheshunoff's summary-judgment evidence against the standard of "involuntary execution" in section 4.105 of the family code. The parties dispute the meaning of "involuntary execution" and the extent to which it can be proven by evidence of common-law defenses like fraud or duress. We accordingly first clarify the nature of this statutory defense before turning to Mr. Sheshunoff's summary-judgment evidence.

#### *Overview of section 4.105*

Section 4.105 of the family code provides:

(a) A partition or exchange agreement is not enforceable if the party against whom enforcement is requested proves that:

(1) the party did not sign the agreement voluntarily; or

10

(2) the agreement was unconscionable when it was signed and, before execution of the agreement, that party:

(A) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(C) did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of the other party.

(b) An issue of unconscionability of a partition or exchange agreement shall be decided by the court as a matter of law.

(c) The remedies and defenses in this section are the exclusive remedies or defenses, including common law remedies or defenses.

*See* Tex. Fam. Code Ann. § 4.105(a). There is no dispute on appeal that the Marital Property Agreement is a "partition or exchange agreement" within the meaning of section 4.105.

Language parallel to that in section 4.105 appears in section 4.006 of the family code, which governs enforceability of premarital, or "antenuptual," agreements. *See* Tex. Fam. Code Ann. § 4.006 (West 1998). Subsections (a) and (b) of each provision track the language of the Uniform Premarital Agreement Act. *See* Unif. Premarital Agreement Act § 6, 9C U.L.A. 48-49 (2001); *see also In re Marriage of Bonds*, 5 P.2d 815, 821-826 (Cal. 2000) (reviewing record of proceedings of National Conference of Commissioners on Uniform State Laws in adopting Uniform Premarital Agreement Act). These portions of the Uniform Act evolved from a debate between commissioners who desired certainty in the enforcement of marital property agreements and those who urged that such agreements should be routinely scrutinized for substantive fairness. *See In re Marriage of*

*Bonds*, 5 P.2d at 825. The former view dominated the debate: the Act provided that a premarital agreement that was voluntarily executed would be enforced, even if unconscionable, as long as the opposing party knew or should have known of the other party's assets, or waived such disclosure. *Id*. The commissioners considered that the voluntariness of a premarital agreement may turn, in part, upon whether the agreement was entered into knowingly, in the sense that the parties understood the terms or basic effect of the agreement. *Id*.

Before the Texas Legislature adopted our version of the Uniform Act, Texas law had required a party seeking to enforce a marital property agreement to prove, by clear and convincing evidence, that the other party had given informed consent and that the agreement had not been procured by fraud, duress, or overreaching. Act of June 18, 1987, 70th Leg., R.S., ch. 678, § 1, sec. 5.46, 1987 Tex. Gen. Laws 2530, 2530-31; *see Williams v. Williams*, 720 S.W.2d 246, 248 (Tex. App.—Houston [14th Dist.] 1986, no writ).[7] Dissatisfaction with this difficult burden of proof led to the legislature's adoption of the Uniform Act in 1987. *See* W. Fred Cameron, Robert S. Hoffman & Allen V. Ytterberg, *Marital and Premarital Agreements*, 39 Baylor L. Rev. 1095, 1102 (1987). By shifting the burden of proof to the party opposing enforcement and by adopting the Uniform Act's concept that voluntarily executed marital property agreements should be enforced even if

_____

[7] This statute represented an expansion of the rights of Texans to alter the status of community or separate property. Throughout the nineteenth and early twentieth centuries, Texas courts had construed the constitutional and statutory provisions governing community property in a manner that sharply limited the ability of married persons or persons intending to marry to alter the status of community or separate property by agreement. *See generally* W. Fred Cameron, Robert S. Hoffman & Allen V. Ytterberg, *Marital and Premarital Agreements*, 39 Baylor L. Rev. 1095, 1100 (1987). In 1980, the voters approved a constitutional amendment allowing greater freedom in this area. Tex. Const. art. XVI, § 15. To implement this amendment, the legislature enacted sections 5.41 and 5.42 of the family code, described above. Cameron, *supra*, at 1101-02.

unconscionable (unless inadequate disclosure can be proven), the Texas Legislature manifested a strong policy preference that marital property agreements should be enforced whenever persons who are married or intend to marry voluntarily enter into them. *See Beck v. Beck*, 814 S.W.2d 745, 749 (Tex. 1991) (public policy dictates that premarital agreements should be enforced), *cert. denied*, 503 U.S. 907 (1992); *Grossman v. Grossman*, 799 S.W.2d 511, 513 (Tex. App.—Corpus Christi 1990, no writ) (premarital agreements are presumptively valid). Barring constitutional impediments, we must defer to these legislative policy pronouncements. *See Battaglia v. Alexander*, No. 02-0701, 48 Tex. Sup. J. 720, 2005 Tex. LEXIS 419, at *62 (May 27, 2005).

As originally enacted, sections 4.006 and 4.105, like the Uniform Act, contained only subsections (a) and (b). *See* Act of June 1, 1987, 70th Leg., R.S., ch. 678, § 1, secs. 5.46, .55, 1987 Tex. Gen. Laws 2530, 2530-31. In 1993, however, the legislature departed from the Uniform Act and added subsection (c) to each. *See* Act of April 30, 1993, 73d Leg., R.S., ch. 136, §§ 1, 2, 1993 Tex. Gen. Laws 283, 283. This amendment apparently responded to *Daniel v. Daniel*, in which our sister court in Houston held that, absent explicit legislative provision to the contrary, the involuntary execution and unconscionability defenses should be construed to "simply provide[] an additional statutory remedy for persons challenging property agreements executed pursuant to the Family Code" and not "to replace all common law defenses." 779 S.W.2d 110, 114 (Tex. App.—Houston [1st Dist.] 1989, no writ). Thus, the *Daniels* court concluded that parties could assert *both* the statutory defenses under section 4.105 *and* common-law contractual defenses against the enforcement of partition and exchange agreements. *Id*. at 114. In subsection (c), the legislature supplied the explicit legislative intent found lacking by the *Daniels* court, providing that the "remedies and defenses in

13

this section are the exclusive remedies or defenses, including common law remedies or defenses."
Tex. Fam. Code Ann. § 4.105(c); *see* House Comm. on Judicial Affairs, Bill Analysis, Tex. H.B.
1274, 73d Leg., R.S. (1993) (purpose of amendment was to clarify "existing law . . . by explicitly
stating that remedies for violations of and defenses to such agreements which are listed by statute
are the exclusive remedies and defenses available").

*Involuntary execution and common-law defenses*

While maintaining that proof of fraud and duress is also evidence of involuntary
execution, Mr. Sheshunoff asserts that involuntary execution "is a broader, less specific defense"
than fraud and duress and that he accordingly does not necessarily have to prove each common-law
element of either defense to prove involuntary execution. In contrast, Ms. Sheshunoff seems to
construe subsection (c) of section 4.105 to foreclose the possibility that proof of a common-law
defense like duress or fraud could also be proof of involuntary execution, though elsewhere she has
appeared to concede that proof of duress might be proof of involuntary execution.

To ascertain the relationship between involuntary execution and fraud or duress, we
first examine the meaning of "voluntarily" in section 4.105. Neither the family code nor the Uniform
Act defines "voluntarily," nor does the legislative history of either provide much guidance regarding
the intended meaning of the term. We can obtain some guidance from dictionary definitions.[8] The

---

[8] We may rely on definitions listed in commonly used dictionaries to discern the plain
meaning of terms in the statute. *See Powell v. Stover*, No. 03-1154, 48 Tex. Sup. Ct. J. 780, 2005
Tex. LEXIS 417, at *9-10 (May 27, 2005); *Texas Dep't of Protective & Regulatory Servs. v. Mega
Child Care, Inc.*, 145 S.W.3d 170, 196 (Tex. 2004).

ordinary meaning of "voluntarily," as reflected in dictionary definitions, entails (1) intentional action, as opposed to inadvertent or accidental action, (2) that is the product of the exercise of free will.[9]

The official comments accompanying the Uniform Act suggest that common-law concepts including duress, lack of capacity, fraud, and undue influence, along with the parties' relative bargaining power and knowledge regarding the meaning and effect of the agreement, could bear upon the ultimate determination of voluntariness. *See Marriage of Bonds*, 5 P.3d at 824-25 (concluding that "the question is viewed as one involving such ordinary contract defenses as fraud, undue influence, or duress, along with some examination of the parties' knowledge of the rights being waived, or at least knowledge of the intent of the agreement"); *Marriage of Shirilla*, 89 P.3d 1, 13 (Mont. 2004) ("The party seeking to avoid a premarital agreement may prevail by establishing that the agreement was involuntary, and that evidence of lack of capacity, duress, fraud, and undue influence, as demonstrated by a number of factors uniquely probative of coercion in the premarital

---

[9] *Webster's Third New International Dictionary* defines "voluntarily" as "in a voluntary manner: of one's own free will: spontaneously," and "voluntary" as "proceeding from the will: produced in or by an act of choice," "performed, made or given of one's own free will," "done by design or intention: not accidental," and "acting of oneself: not constrained, impelled, or influenced by another." *Webster's Third New International Dictionary* 2564 (1986). Similarly, the *American Heritage Dictionary* defines "voluntary" as "[a]rising from one's own free will: acting on one's own initiative," "normally controlled by or subject to individual volition," "[c]apable of exercising will, volitional," and "[a]cting or performed without external persuasion or compulsion." *American Heritage Dictionary* 1436 (1973).

Some definitions, moreover, indicate that voluntariness implies knowledge of "essential facts." *Black's Law Dictionary* defines "voluntarily" as "[d]one by design or intention, intentional, proposed, intended or not accidental, intentionally and without coercion," and "voluntary" as "[u]nconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself. Done by design or intention. Proceeding from the free and unrestrained will of the person. Produced in or by an act of choice. Resulting from free choice. The word, especially in statutes, often implies knowledge of essential facts." *Black's Law Dictionary* 813 (7th ed. 1999).

15

context, would be relevant in establishing the involuntariness of the agreement."). Some courts, moreover, have equated voluntariness under the Uniform Act with "procedural fairness," which takes account of such factors as coercion, duress, undue influence, and the parties' relative bargaining power and sophistication. *See Marriage of Bonds*, 5 P.3d at 826-27.

Texas courts have construed "voluntarily" under sections 4.105 and 4.006 in a generally consistent manner. In *Nesmith v. Berger*, for example, we assumed without deciding that the appellant's definition of "voluntarily," derived from common-law duress concepts, controlled our inquiry under section 4.006: "an action is taken by design, intentionally, purposefully, by choice, of one's own accord, or by the free exercise of will." 64 S.W.3d 110, 113-16 (Tex. App.—Austin 2001, pet. denied) (citing *Prigmore v. Hardware Mut. Ins. Co. of Minn.*, 225 S.W.2d 897, 899 (Tex. Civ. App.—Amarillo 1949, no writ)).[10] We applied this definition to an involuntary execution claim predicated on a husband's threat not to go on a planned honeymoon unless his wife first signed a premarital agreement. *Id*. at 11-15. Citing evidence of the parties' mutual desire to enter into such an agreement, the wife's motives for entering into the agreement, bargaining over terms, and both parties' subsequent compliance with the agreement, we overruled a great weight and preponderance challenge to the trial court ruling enforcing the agreement. *Id*. We concluded that "[i]n light of the bargaining that accompanied every step of the relationship between the parties before and during their marriage, we cannot say that [the husband's] proposed bargain to finalize the terms of the long-

---

[10] This definition had been suggested by the party opposing enforcement of a premarital agreement. Because we ultimately held that she had acted voluntarily even under her proposed definition, we did not need to consider the validity of that definition. *Nesmith v. Berger*, 64 S.W.3d 110, 113-16 (Tex. App.—Austin 2001, pet. denied).

contemplated agreement before leaving on a honeymoon *exerted such undue influence as to deprive [the wife] of her free will in signing the agreement.*" *Id*. at 115 (emphasis added); *see also Marsh v. Marsh*, 949 S.W.2d 734, 740-43 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (in reviewing unconscionability defense, considering whether evidence of threats, fraud, overreaching, duress, or misrepresentations, as well as parties' relative sophistication, experience, and bargaining power).[11]

In *Nesmith*, we relied in part on the Fort Worth court's analysis in *Matelski v. Matelski*, 840 S.W.2d 124, 128-29 (Tex. App.—Fort Worth 1992, no writ). *Matelski*, like some other decisions from our sister courts, simply equates involuntary execution with common-law duress.[12] *See Osorno v. Osorno*, 76 S.W.3d 509, 510-11 (Tex. App.—Houston [14th Dist.] 2002,

---

[11] At least one court has suggested that, when analyzing unconscionability, the *Marsh* court actually examined factors bearing on voluntariness or procedural fairness. *Marriage of Bonds*, 5 P.3d 815, 815, 826 & n.9 (Cal. 2000).

Mr. Sheshunoff also cites an unreported decision from the Dallas Court of Appeals addressing a choice of law issue in the enforcement of a Hawaii premarital agreement. *See Rathjen v. Rathjen*, No. 05-93-00846-CV, 1995 Tex. App. LEXIS 3759, at *7-12, *23-24 (Tex. App.—Dallas 1995, no pet.) (not designated for publication). The court characterized Hawaii law as substantially similar to Texas law and suggested that "it is likely that the [agreement] would be equally valid in Texas as it is under Hawaii law." *Id*. at *24. It also stated that "[t]he Hawaii Supreme Court has defined lack of voluntariness as the 'absence of true assent to the agreement due to duress, coercion, undue influence, or any other circumstances indicating that the wife did not freely and voluntarily enter into the agreement." *Id*. at *7.

[12] The *Matelski* court described the elements of duress as follows:

> There can be no duress unless there is a threat to do some act which the party threatening has no legal right to do. Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and that which he was not legally bound to do. The restraint caused by such threat must be imminent. It must be such that the person to whom it is directed has no present means of protection.

*Matelski v. Matelski*, 840 S.W.2d 124, 129 (Tex. App.—Fort Worth 1992, no writ) (*quoting Dale*

17

no pet.) (as matter of law, no duress in premarital agreement based on threat by party to commit act they have legal right to do).[13]

The ordinary meaning of "voluntary," the legislative history and application of the Uniform Act, and the manner in which Texas courts have construed the term compel us to agree with Mr. Sheshunoff—although the presence of such factors as fraud, duress, and undue influence may bear upon the inquiry, Mr. Sheshunoff does not have to prove each element of these common-law defenses to establish the ultimate issue of involuntary execution. *See Daniel*, 779 S.W.2d at 114 & n.4 (observing that involuntary execution "alleviates the need for proof of all elements required in common law defenses," such as knowledge or reliance elements of fraud). We implied as much in *Nesmith*, where we looked not to the elements of common-law defenses but directly to the

---

*v. Simon*, 267 S.W. 467, 470 (Tex. Comm'n App. 1924, judgm't adopted)).

[13] Both parties rely on *Blonstein v. Blonstein*, which suggested some other comparisons between the involuntary execution defense and various common-law defenses. 831 S.W.2d 468, 471 (Tex. App.—Houston [14th Dist.] 1992, writ denied). The court of appeals held that the trial court did not abuse its discretion in refusing to separately submit jury issues on duress, overreaching, and undue influence because these issues had been subsumed by a broad-form submission inquiring whether a spouse "voluntarily execute[d] the marital property agreement." *Id*. In the court's view, the proposed issues on duress, overreaching, and undue influence each inquired "as to whether David Blonstein's free will was overcome by threats or other acts of Esther Blonstein," and "[a]sking whether David Blonstein acted voluntarily is the same as asking whether he acted by his free will." *Id*. *Blonstein* also went on to hold that requested issues on fraud, estoppel and breach of fiduciary duty were subsumed in a broad-form submission inquiring as to the adequate knowledge and reasonable disclosure elements of section 4.105's unconscionability defense. *Id*.; *see* Tex. Fam. Code Ann. § 4.105(a)(2) (West 1998).

We observe that the Texas Supreme Court subsequently denied writ of error in a *per curiam* opinion cautioning that it was expressing no opinion regarding the analysis of the jury submissions by the court of appeals. 848 S.W.2d 82 (Tex. 1992) (*per curiam*). Given the supreme court's reservations, we will not rely on the *Blonstein* court's comparison of duress, fraud, and the statutory defenses.

18

controlling issue of whether the party resisting enforcement executed the agreement voluntarily. *See Nesmith*, 64 S.W.3d at 114-15. This approach is consistent with the text of section 4.105, which refers not to common-law concepts but solely to whether the party signed the agreement voluntarily. Tex. Fam. Code Ann. § 4.105(a)(1); *see Office of the Attorney Gen. of Tex. v. Lee*, 92 S.W.3d 526, 528 (Tex. 2002).[14]

Ms. Sheshunoff contends that the legislature's addition of subsection (c) renders irrelevant the history and application of the involuntary execution defenses under the Uniform Act. We disagree. Subsection (c) was intended to clarify merely that, contrary to *Daniels*, parties cannot assert common-law defenses *in addition* to the defenses enumerated in section 4.105. It does not prohibit us from considering as potential evidence of involuntary execution proof of conduct that Mr. Sheshunoff asserts constitutes fraud or duress.

In sum, we conclude that section 4.105 sets out the exclusive remedies available to prevent enforcement of a postmarital agreement, and that, although common-law defenses may inform our analysis of "voluntariness," they will not necessarily control.

### *Analysis of the summary-judgment evidence*

Mr. Sheshunoff contends that he has raised genuine issues of material fact regarding his involuntary-execution defense with summary-judgment evidence of two series of acts by Ms.

---

[14] We have adopted a similar approach in at least one other context—when reviewing the voluntariness of a mother's signing of an affidavit relinquishing her parental rights. *See Vela v. Marywood*, 17 S.W.3d 750, 762 (Tex. App.—Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001) (per curiam) ("Although the face of the affidavit reflects it was signed knowingly and voluntarily, we must consider the surrounding circumstances to determine if Corina's signature on the document was procured by misrepresentation, fraud, or the like.").

Sheshunoff. First, Mr. Sheshunoff presented affidavit testimony that, during the week before he signed the Agreement, Ms. Sheshunoff "began threatening me . . . that unless I signed the Agreement, she would withdraw her loan guarantee and have the Bank of America immediately call the line of credit for the Sheshunoff companies." He testified that this event would have been "catastrophic to the financial stability of the companies" and would have rendered the companies unable to pay salaries, jeopardized over seventy jobs, and risked the loss of key, irreplaceable employees.

Second, Mr. Sheshunoff presented summary-judgment evidence that, while negotiating the Agreement, Ms. Sheshunoff and her agents misled him to believe that she, like Mr. Sheshunoff, intended to execute the Agreement solely for estate and tax-planning purposes and had no intention to actually proceed with a divorce, when in fact she was surreptitiously plotting a divorce. He points to evidence that, among other things, Ms. Sheshunoff had assured him that executing the Agreement would strengthen their marriage, when she had secretly hired a divorce lawyer (in contrast to the estate and tax lawyers each party had retained) while the negotiations were still ongoing, and that, a few days before execution, she had the locks at their house changed while he was traveling.[15] He urges that he never would have agreed to the "draconian" property division under the Agreement had he anticipated he and Ms. Sheshunoff would actually divorce.

As previously suggested, the precise parameters of involuntary execution may not be clear in every case, and will tend to depend on the circumstances. In this case, however, we can determine that, as a matter of law, Mr. Sheshunoff has failed to raise a fact issue regarding

---

[15] Ms. Sheshunoff denies these allegations.

involuntary execution. We begin by observing that the following facts bearing on involuntary execution are undisputed:

- The parties were each sophisticated. Mr. Sheshunoff, in fact, has run their successful consulting business in the financial services industry for many years;

- The parties had executed both a premarital agreement and an earlier post-marital property agreement, and understood the general purpose and effect of such agreements;

- The parties had extensively negotiated the Marital Property Agreement at issue over a period of several months;

- During the negotiation and execution of the Agreement, each party had the assistance of a team of capable counsel, as well as accountants and other professional advisors; and

- When executing the Agreement, Mr. Sheshunoff and his counsel knew of the Agreement's material terms, including provisions explicitly contemplating that the agreed-upon property division would be effective upon the death or divorce of the parties.[16]

In this context, Mr. Sheshunoff advances two theories of involuntary execution: (1) he was forced into signing the Agreement; and (2) he was misled into signing it in the belief that Ms. Sheshunoff would not actually seek a divorce and avail herself of her rights to the agreed-upon property division.

---

[16] In fact, in August 2002, Duncan Osborne, an attorney who had been working with the Sheshunoffs in drafting the Agreement, cautioned them that he was concerned about the disparity in the proposed property division:

> because what the two of you agree upon for tax purposes at this time would be evidence of proper division in the event of a future dispute involving your relative property ownership, we think that it is important for Alex to engage separate counsel hired solely to look after Alex's interests, to go through the analysis that has been prepared and explain its potential implications to Alex, before final decisions regarding the marital property division are reached.

21

To support his first involuntary execution theory, Mr. Sheshunoff presented an affidavit in which he claims that Ms. Sheshunoff threatened him that, unless he signed the Marital Property Agreement, "she would withdraw her loan guarantee" she had advanced his company, Alex Sheshunoff Management, L.P., "and have the Bank of America immediately call the line of credit," leading to dire consequences for the company. He attaches copies of the loan documents, which demonstrate that (1) Ms. Sheshunoff, along with Mr. Sheshunoff, was a guarantor on a $1 million loan agreement between Bank of America and Alex Sheshunoff Management Services, L.P.;[17] and (2) the promissory note provided that Bank of America "will have no obligation to advance funds" on the company's revolving line of credit if "any guarantor seeks, claims, or otherwise attempts to limit, modify, or revoke such guarantor's guarantees of this Note or any other loan with Lender." However, this evidence shows, at most, that Ms. Sheshunoff threatened to withdraw her loan guarantee and that her doing so would have *entitled* Bank of America to cut off the line of credit. Mr. Sheshunoff offers no proof, and only the conclusory statement in his affidavit, regarding the likelihood that Bank of America in fact would have exercised this contractual right, at Ms. Sheshunoff's behest or otherwise.[18] Absent such proof, the jury could not reasonably infer—and could only speculate—that Ms. Sheshunoff's alleged threat to withdraw the loan guarantee presented the sort of imminent threat that Texas law has considered capable of overwhelming free will and

[17] Ms. Sheshunoff asserts that Mr. Sheshunoff failed to offer any evidence that she actually ever signed such a guarantee. However, the "Notice of Final Agreement" listing the component loan documents designates Ms. Sheshunoff as "Guarantor 2," and is signed by Ms. Sheshunoff as "Guarantor." This evidence, along with Mr. Sheshunoff's affidavit, raises a fact issue regarding whether Ms. Sheshunoff was a guarantor of the loan.

[18] We further note that Ms. Sheshunoff does not appear to have been the sole or primary guarantor on the loan agreement, but was designated "Guarantor 2."

22

rendering Mr. Sheshunoff's execution of the Marital Property Agreement involuntary. *See Wright v. Sydow*, No. 14-03-00222-CV, 2004 Tex. App. LEXIS 10541, at *15 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *King v. Bishop*, 879 S.W.2d 222, 223 (Tex. App.—Houston [14th Dist.] 1994, no writ); *Charping v. Light*, 578 S.W.2d 462, 464 (Tex. Civ. App.—Austin 1979, no writ) (quoting *Dale v. Simon*, 267 S.W. 467, 470 (Tex. Comm'n App. 1924, judgm't adopted)). It is thus no evidence.[19]

As for Mr. Sheshunoff's second theory of involuntary execution, he does not dispute that he and his team of lawyers and advisors knew that the Agreement explicitly provided for the property division he now characterizes as "draconian" and that it would be effective if the parties divorced. Nor, significantly, does Mr. Sheshunoff claim that he was misled concerning the presence of these terms in the Agreement or that they were concealed from him.[20] Rather, Mr. Sheshunoff contends only that he was misled concerning Ms. Sheshunoff's subjective intent to avail herself of her rights under the Agreement. Although not singularly determinative, it is significant that our sister courts have held that this type of conduct, even if proven, would not constitute fraud under Texas law. *See In re GTE Mobilnet of S. Tex. Ltd. P'ship*, 123 S.W.3d 795, 799-800 (Tex. App.—Beaumont 2003, orig. proceeding) (alleged misrepresentations that company would not

---

[19] Having concluded that, for the above reasons, Ms. Sheshunoff's evidence concerning the loan guarantee does not raise a fact issue concerning involuntary execution, we need not address Ms. Sheshunoff's arguments predicated on her view that she had the legal right to revoke the guarantee. *See Osorno*, 76 S.W.3d at 510-11 (as matter of law, no duress based on threat by party to commit act they have legal right to do). Nor do we address whether this element of the duress defense properly bears upon our analysis of involuntary execution.

[20] As Ms. Sheshunoff's counsel suggested during oral argument, the situation might have been different had she, for example, surreptitiously switched pages in the Agreement.

23

enforce contractual arbitration clause known to parties could not constitute fraudulent inducement as matter of law). Similarly, we would impermissibly deviate from the statutory language—and the legislature's manifest intent to facilitate enforcement of marital property agreements—by holding that a party who executes a marital property agreement with knowledge and understanding of its terms nonetheless did so "involuntarily" because he or she believed the other party would not enforce the agreement.

We accordingly conclude that Mr. Sheshunoff has failed to raise a fact issue regarding his involuntary execution defense. Our conclusion is not altered by Mr. Sheshunoff's assertions that Ms. Sheshunoff, as his spouse, owed him a fiduciary duty to be truthful during their negotiations. *See Buckner v. Buckner*, 815 S.W.2d 877, 880 (Tex. App.—Tyler 1991, no writ). Assuming without deciding that such a duty would apply under the circumstances of this case,[21] the Texas Legislature enacted section 4.105 with the understanding that married spouses owing fiduciary duties to one another would negotiate and execute marital property agreements. *See* Tex. Gov't Code Ann. § 311.023 (West 2005) (court to consider laws on same or similar subjects when construing statutes);

---

[21] We disapprove, however, Ms. Sheshunoff's view that *Miller v. Ludeman*, 150 S.W.3d 592, 597 (Tex. App.—Austin 2004, pet. denied), stands for a categorical rule that spouses who hire separate counsel to negotiate a property division can never owe fiduciary duties to one another. Husbands and wives generally owe a fiduciary duty to one another. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998); *Matthews v. Matthews*, 725 S.W.2d 275, 279 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). The fiduciary duty arising from the marriage relationship does not continue when a husband and wife each hire independent professional counsel to represent them in a contested divorce proceeding. *Boyd v. Boyd*, 67 S.W.3d 398, 405 (Tex. App.—Fort Worth 2002, no pet.); *Parker v. Parker*, 897 S.W.2d 918, 924 (Tex. App.—Fort Worth 1995, writ denied). Although we cited *Boyd* in noting that the appellant in *Miller* conceded that adverse parties who have retained professional counsel (including husbands and wives in a suit for divorce) do not owe fiduciary duties to one another, we did not adopt the position asserted by Ms. Sheshunoff in this appeal. *See Miller*, 150 S.W.3d at 597.

24

*Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 530-31 (Tex. 2002) (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.")). Notwithstanding these duties, the legislature manifested the strong policy preference that voluntarily made marital property agreements be enforced. We have concluded that Mr. Sheshunoff has not raised a fact issue regarding the sort of involuntary execution the legislature could have intended to bar enforcement of marital property agreements. That conclusion would control even in the face of the fiduciary duties Mr. Sheshunoff claims.

We accordingly hold that the district court did not err in granting Ms. Sheshunoff's motion for partial summary judgment. We overrule Mr. Sheshunoff's first issue.

**Striking of new defenses and counterclaims**

In his second issue, Mr. Sheshunoff contends that the district court abused its discretion in striking the defenses and counterclaims he raised in his amended pleadings several months after the district court had granted partial summary judgment. When a trial court strikes a party's pleadings, we employ an abuse-of-discretion standard. *See Porter v. Nemir*, 900 S.W.2d 376, 384 (Tex. App.—Austin 1995, no writ). We reverse a trial court for abusing its discretion only if we find that the court acted in an unreasonable or arbitrary manner, *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991), or "without regard for any guiding rules or principles." *Owens Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (quoting *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995)); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A corollary principle is that we may not reverse for abuse of discretion

25

merely because we disagree with a decision of the trial court, if that decision was within the trial court's discretionary authority. *Downer*, 701 S.W.2d at 242.

Mr. Sheshunoff did not assert his new defenses and counterclaims until after the district court had granted Ms. Sheshunoff's partial summary-judgment motion, nor did he assert them as grounds for denying the first summary-judgment motion. Our disposition of Mr. Sheshunoff's second issue thus turns principally on the scope of Ms. Sheshunoff's partial summary-judgment motion and whether the district court, by granting it, foreclosed the defenses and counterclaims he later attempted to raise. *See Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (affirmative defense must be raised with some evidence to avoid summary judgment); *Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 670-71 (Tex. App.—Austin 2005, no pet.); *Martin v. First Republic Bank, Fort Worth, N.S.*, 799 S.W.2d 482, 488 (Tex. App.—Fort Worth 1990, writ denied) (counterclaim for reformation or recision of contract obligations not properly filed after court has enforced obligations on summary judgment). Mr. Sheshunoff asserts that Ms. Sheshunoff's motion for partial summary judgment challenged only the validity of his involuntary execution and unconscionability defenses, and therefore did not preclude him from subsequently raising other defenses and his counterclaims. We disagree.

Ms. Sheshunoff explicitly sought summary judgment to "declare the February 8, 2003, 'Marital Property Agreement' executed by and between the parties fully enforceable." Although her motion emphasizes the two statutory defenses and did not specifically address any others, she also argued that there are no other defenses to the enforcement of the Agreement. Her motion adequately supports the district court's partial summary judgment that the Marital Property Agreement is fully enforceable. Because Mr. Sheshunoff failed to raise any additional defenses

before this ruling, they are untimely and cannot bar summary judgment. *See Voice of the Cornerstone Church Corp.*, 160 S.W.3d at 670-71.

Alternatively, we also hold that subsection (c) of section 4.105 independently bars Mr. Sheshunoff's attempt to assert common-law defenses and counterclaims distinct from the statutory involuntary execution and unconscionability defenses. *See* Tex. Fam. Code Ann. § 4.105(c). In a post-submission letter, Mr. Sheshunoff conceded that his common-law defenses were barred by subsection (c). We conclude that his common-law counterclaims for rescission or damages are similarly barred, as such relief would simply undo the bargain reflected in the Marital Property Agreement, which the legislature has mandated must be enforced unless the exclusive statutory defenses are proven.

We overrule Mr. Sheshunoff's second issue.

**Reformation claims**

In his third issue, Mr. Sheshunoff argues that the district court abused its discretion in severing his post-summary judgment reformation counterclaims and referring them to arbitration. Mr. Sheshunoff contends that Ms. Sheshunoff had waived her right to arbitrate the claims because litigation had progressed for over a year by the time she first sought to compel arbitration in May 2004. As Ms. Sheshunoff observes, however, Mr. Sheshunoff did not raise his reformation counterclaims until April 30, 2004,[22] only a month before she sought arbitration. Under these facts, we cannot conclude that the district court abused its discretion in failing to find that Ms. Sheshunoff had waived her right to arbitrate Mr. Sheshunoff's reformation counterclaims. *See In re Automated*

---

[22] *See supra*, n.4.

27

*Collection Techs.*, 156 S.W.3d 557, 559 (Tex. 2004) (quoting *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704 (Tex. 1998) ("even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result")). We overrule Mr. Sheshunoff's third issue.

**Remaining issues**

Mr. Sheshunoff's fourth issue, challenging the district court's striking of his jury demand, and his fifth issue, challenging the final summary judgment, are each predicated on his prevailing in his first three issues. Because we have overruled those issues, we likewise overrule Mr. Sheshunoff's fourth and fifth issues.

**CONCLUSION**

We overrule all of Mr. Sheshunoff's issues and affirm the district court's rulings (1) granting partial summary judgment, (2) striking Mr. Sheshunoff's subsequently-asserted defenses and counterclaims for damages and rescission, (3) severing and compelling arbitration on his reformation counterclaims, (4) striking his jury demand, and (5) granting final summary judgment in favor of Ms. Sheshunoff.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:   July 29, 2005