COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                               NO.
02-08-00201-CV

 

 

THERESA ANN SANDERS                                                                 APPELLANT

                                                                                                    AND
APPELLEE

 

                                                             V.

 

ROYCE ALLEN SANDERS                                                                    APPELLEE

                                                                                                  AND
APPELLANT

 

 

                                                       ------------

 

              FROM
THE 360TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

Appellant/Cross-Appellee
Theresa Ann Sanders and Appellee/Cross-Appellant Royce Allen Sanders appeal
from the trial court=s judgment granting their
divorce.  No children were born of the
marriage; the issues concern only the trial court=s
characterization of marital property and division of the community estate.  Royce contends that mental incapacity is not
a valid ground for setting aside the couple=s
two postnuptial agreements and that the evidence is legally and factually
insufficient to support the trial court=s
finding that Theresa lacked the mental capacity to execute the agreements.  Theresa contends that the trial court erred
by characterizing as separate three commercial lots of real property and the
improvements thereon (collectively, Athe
Property@)
conveyed to Royce during the marriage by the closely held class C corporation
he had owned since before the marriage. 
Because we hold that the trial court did not err, we affirm the trial
court=s
judgment.

Mental Incapacity

During
the marriage, Royce and Theresa executed two separate postnuptial agreements,
one in November 1997 and one in May 1999. 
In the divorce decree, the trial court found that Theresa lacked the
mental capacity to voluntarily enter into the agreements.  In the findings of fact and conclusions of
law issued after our abatement of this case, the trial court also found that
Theresa Adid
not voluntarily execute the November 1997 Post-Nuptial Agreement and the May
1999 Post-Nuptial Agreement because she did not have the mental capacity to do
so.@  The trial court therefore concluded that the
two postnuptial agreements were not enforceable.

In
his first issue, Royce contends that mental incapacity is not a ground for
setting aside a postnuptial agreement. 
He is technically correct.  The
controlling statute provides that involuntariness and unconscionability are the
exclusive defenses to partition and exchange agreements.[2]  There is no dispute that both the 1997 and
the 1999 postnuptial agreements are partition and exchange agreements.  Royce concedes, however, that the trial court
found that Theresa involuntarily executed the agreements based on her mental
incapacity.  Further, we agree with our
sister court in Austin that common law contract defenses may influence our
analysis of voluntariness, which is not defined in the statute.[3]  Mental incapacity is a common law contract
formation defense.[4]  Accordingly, whether Theresa had mental
capacity to contract when she executed the agreements can and will inform our
analysis of voluntariness.  We therefore
overrule Royce=s
first issue.

In
his second issue, Royce contends that the evidence is legally and factually
insufficient to support the trial court=s
finding that Theresa lacked the mental capacity to execute the agreements.  Findings of fact entered in a case tried to
the court have the same force and dignity as a jury=s
answers to jury questions.[5]  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s
answer.[6]

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.[7]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[8]

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.[9]

As
the Austin court points out, AThe
ordinary meaning of >voluntarily,= as
reflected in dictionary definitions, entails (1) intentional action, as opposed
to inadvertent or accidental action, (2) that is the product of the exercise of
free will.@[10]  To show mental incapacity, a person seeking
to set aside an agreement must show that she did not understand the nature and
consequences of her act at the time the agreement was made.[11]  Whether a person had mental capacity to enter
into an agreement can be shown by circumstantial evidence including, for
example, (1) her outward conduct demonstrating an Ainward
and causing condition@; (2) preexisting external
circumstances tending to produce a special mental condition; and (3) a mental
condition before or after the relevant point in time from which her mental
capacity or incapacity could be inferred.[12]  Generally, the issue of mental incapacity is
an issue of fact.[13]  Further, the necessary proof of mental
incapacity is within the common knowledge and experience of laypersons;
therefore, expert testimony is not required.[14]

Royce,
Theresa, and Ann Beal, Theresa=s
licensed professional counselor, testified. 
Additionally, several exhibits were admitted, most containing Theresa=s
medical records.

Theresa
testified that she was forty-three years old at the time of trial, that she had
four adult children, and that she had been married five times, twice to Royce,
whom she had first met in February 1985. 
When they met, Theresa Awas
dabbling@ in A[m]ethamphetamines,
street drugs, [and] speed,@ but
she denied using drugs after they started dating.  Three months after they met, Royce moved in
with Theresa and her children, even though he was still married.  The next month, he rented a house in
Grapevine, where they all lived until August 1, 1985, when he reconciled with
his wife.  Theresa and the children moved
in with her parents, but she still saw Royce.

Theresa
testified that she got pregnant in the fall of 1985 and that Royce told her
that she could either terminate the pregnancy or raise the baby alone, so she
terminated the pregnancy in January 1986. 
As a result of the abortion, her uterus had to be removed six weeks
later, and within six months, her ovaries stopped functioning.  Theresa was on Medicaid at the time of her
surgery because she had no insurance.  On
cross-examination, Theresa admitted that she had also had an abortion in the
period between her first and second marriages.

Theresa
testified that also in January 1986, she and her children moved into a house
that Royce had rented for them, and he moved in with them in February.  As of January 1986, Theresa testified, she
had never had any drug treatment or psychiatric or psychological care.

In
1988, they all moved to a house in Bedford. 
In May 1988, Theresa started using methamphetamines again.  Her usage increased, and she Astarted
using more and more and more and more.@  She did not obtain any drug treatment in this
period.

Theresa
testified that a doctor, AUncle Mike,@ had
had sexual intercourse with her from the time she was seven years old until she
was sixteen years old.  She testified
that her father started Amessing with [her]@
when she was almost four years old and had penetrated her on Christmas Eve when
she was seven years old.  Her father=s
sexual abuse of her continued until she was in her early twenties.  During the long period over which the sexual
abuse occurred, she did not seek and was not provided any psychological
treatment.

Theresa
testified that the first time she went to a treatment center for drug use or
psychological problems was in 1989 or 1990, when she went to Rio Valley
Recovery Center for depression.  She said
that she was hospitalized for severe depression and was very suicidal.  She testified that she had taken Aa
bunch or Royce=s
pills.@  She stated that Royce had not wanted her to
go to the facility.  He testified that he
did not know when she left home to go to the center and that he went there to
visit her.  According to Theresa, she was
diagnosed at the center with severe depression and post-traumatic stress
syndrome.  She was prescribed Pamelor but
did not take it after she left the center.

In
1990 or 1991, Theresa traveled to Las Vegas and confronted her mother about the
doctor=s
sexual abuse of her.  She testified that
she then began seeing Dr. Webster, who diagnosed her as being bipolar in 1991.  Royce testified on cross-examination that A[s]he
had been diagnosed with everything,@ and
he could not remember when she was first diagnosed as bipolar.  Theresa stated that she believed Dr. Webster
placed her on Lithium, Tegretol, Depakote, and an anti-anxiety drug.  She testified that she tried to take the
prescribed medication on a daily basis until sometime after 1993, when she had
no health insurance.  While she was
taking the medication, Athe more [she] was facing
issues and dealing with stuff, the more it seemed like [she] would override it,
and it just wasn=t working.@  Theresa=s
breast implants also ruptured during this time period.  At the end of 1994, Royce divorced his first
wife.

Theresa
testified that she sought treatment at JPS Trinity Springs Hospital in late
March or early April 1995.  She stated
that before she sought treatment, she had tried to commit suicide, she had lost
her breast, she could not walk and was paralyzed from the waist down, she was
in a wheelchair, and she had just gone through chemotherapy.  Theresa stayed at the hospital for a
month.  She testified that she took
medication for her bipolar condition while in the hospital and that it was
covered by Medicaid.  According to
Theresa, when she left the hospital, she was on Zoloft, Depakote, and an
anti-anxiety drug.

Theresa
sought MHMR treatment in February 1995 and also attended a May 1995
appointment.  She was discharged in
November 1995 for failing to follow up.

On
August 1, 1995, Theresa and Royce married in Jamaica.  When they returned home, they discovered her
son Acollecting
blood in a vial.@  Theresa testified that ARoyce
said [they were] going to have to get an annulment.  And then [she] was going to have to get on
Medicaid because he could not pay for [her son=s
treatment.]@  He did not dispute her testimony.  The marriage was annulled on August 24,
1995.  But the couple did not stop living
together.

Theresa
stated that she did not take her prescribed medication for her bipolar
condition until she Agot back on Medicaid again,
because [they] had no insurance.@  She also testified that she was back on it
around Christmas 1995, and after that, Royce hired her, and she had health
insurance under his company policy.  She
additionally testified that she believed that she took the medication as
prescribed until she lost her Medicaid in December 1995, when she remarried
Royce.

Theresa
described 1995 as one of her hardest times: 

I
came out about my father.  My kids were
not doing good, at all.  I wasn=t a good mom.  I couldn=t walk. 
I had a daughter inpatient while I was inpatient.  My [other] daughter . . . pushed my
wheelchair over there so I could see her. 
And Royce walked beside her.  He
couldn=t handle pushing the
wheelchair that I was in.

 

She stated that in 1995, she
was still in denial about the bipolar diagnosis but had started to believe that
it was possible.  Theresa testified that
before her marriage, she Adidn=t
see the manic.  All [she saw] was the
depression.@  When asked if she recalled how she felt when
she was manic, she stated, AAll
I know is I didn=t sleep.  That=s
all I remembered.  I don=t
remember the high.  It felt like a
low.  I hurt.  It felt like a low.  That was depression to me.@

Theresa
testified that she believed that she continued to take her prescribed
medication in 1996, when she was seeing Dr. Bernard Rousch and therapist
Colleen Johnson.  But she was Atotally
alienated@
from her family in Las Vegas after confronting them with the sexual abuse
perpetrated on her by her father.  She
said that she Afelt
like a zombie, like a robot sometimes[, and like she] just existed through the
day@
until her doctors changed her medicine so that she Adidn=t
feel as drugged.@  But when asked about the effects of the
changed prescriptions on her in 1996, she testified, AYou
didn=t
feel.  You didn=t
feel joy.  You just felt hurt.  But you didn=t
feel joy.  You didn=t
feel.  You justCyou
didn=t
function.  Sometimes I wouldn=t
cook.  . . . I was tired a lot.  [The medicine would] make you want to sleep.@  These effects occurred several months,
lasting until near the end of 1996.

Theresa
testified that in the first ten months of 1997, A[a]
lot of yelling and fighting and screaming@ was
occurring in the home.  She testified
that she believed that she was under psychiatric care during this time and that
she was on Lithium, Depakote, Neurontin, Zoloft, Effexor, Paxil, and
Risperdal.  She stated that as an effect
of the medication, she did not smile and stopped laughing.

In
the fall of 1997, Theresa and Royce both filed for divorce.  Royce lived with his ex-wife briefly before
returning home to Theresa around Halloween in 1997.  After Royce and Theresa reconciled, they
signed the first postnuptial agreement, as did their lawyers.  Theresa remembered signing it.  At that point, Theresa was seeing therapist
Colleen Johnson several times a week because she and Royce were having severe
problems at home.  On cross-examination,
Theresa testified that she saw her psychiatrist four times during the week that
she and Royce signed the first postnuptial agreement, including November 10,
1997, the day before they signed it.  She
also testified that she saw her therapist on November 11, 1997, the same day
and immediately before she and Royce signed the first postnuptial agreement and
that Royce discussed the agreement with the therapist.  Theresa admitted that she participated in the
conversation A[a]s
much as [she] could.@

Theresa
conceded on cross-examination that she was working some during the months of
October, November, and December 1997; that she had her first checking account
and credit card during that period and used them; that she sometimes drove to
the store and bought things; that she and Royce were both raising the children;
and that she knew what was going on some of the time.

But
she also testified that she was on and off her medication during this period,
that sometimes she was Ajust numb,@ Aa
robot,@ Aexist[ing],@ and
that she was Anot
in a good place@ on November 11, 1997.  Specifically, she Awas
very suicidal.@  Theresa testified on cross-examination that
she was not in the hospital when she executed the first postnuptial agreement
but that she A[s]hould
have been.@

Theresa
stated that she was still taking her medicine at that time but that she could
not discern any benefits from it.  AThey
had to keep increasing it because it was getting worse and worse.  The depression was back, and it was
worse.  And it was worse.  It wouldn=t
ease up, not then.@

In
December 1997, about six weeks after she and Royce signed the first postnuptial
agreement, Theresa tried to kill herself again. 
She stated that she was still taking her prescribed medication at that
point but that it was still not helping. 
She described her life during the months of October through December of
1997:  AWe
were going through a divorce.  We were
fighting.  I wanted it to stop.  I wanted the pain to stop.  I wanted us to stop hurting each other.  I wanted the fighting to stop.  I wanted him to let me sleep at night.@

After
she tried to kill herself, Theresa was committed to Harris Methodist Springwood
Hospital.  Beal testified about the
medical records from Springwood.  The
application for detention, prepared in part by Royce, provides,  A[Theresa]
fired a gun in her bedroom attempting to kill herself.  She has a history of mental illness and
suicidal tendencies for about four years. 
She is also manic depressant.@  The exhibit shows that in the week preceding
the shooting, Theresa had been on Prozac, Neurontin, Estrogen, Lithium,
Lithobid, and a testosterone medicine.

Royce
admitted that he might have told the police on the night of her suicide attempt
that Theresa had a history of mental illness, and he admitted at trial to
knowing that she was manic depressive at that point.  He also admitted that the descriptionCAshe
. . . was suicidal at times@Cin
the period before her December 1997 suicide attempt was Aprobably
close.@

Theresa
testified that after her release from the hospital in January 1998, she was
placed on a stronger dose of Risperdal for Apsychotic
episodes.@  After she left Springwood, she went to a Awoman
recovery place.@  She testified that she was so drugged that
someone else had to drive her to the AA retreat that year.

In
March 1998, Royce took Theresa to a Dallas psychiatrist.  After three sessions, she stopped seeing that
psychiatrist because Royce asked her to and because the company=s
insurance no longer covered Aserious
mental health.@  Theresa testified that she then Ahad
to go to a different type of doctor that would treat [her] for depression and
not bipolar.  Because the insurance
wouldn=t
pay.@  Royce admitted that he stopped her from going
to the Dallas psychiatrist because each session cost him $150, and he did not
want to pay the money.

In
September 1998, Theresa had a bladder surgery. 
About four weeks later, she and Royce went to Las Vegas, where,
according to Theresa, he raped her.  She
explained that they had agreed to try to have sex but to stop if it hurt
her.  It hurt, but, according to Theresa,
Royce did not stop and Atore down the bladder
surgery,@
causing bleeding.  Royce testified that
he stopped when she asked him to stop. 
At that point, she and Royce separated, and she filed for divorce again.  She and her daughter moved into a hotel until
approximately January 1999.  Royce came
to the hotel to see her A[a]lmost all the time,@
staying late but not spending the night.

During
this time, Theresa was seeing another psychiatrist, Dr. Grant, and his
associates.  Theresa stated that her
medicine was changed to Wellbutrin, Adderall, and Celexa.  She testified that she took these medications
until April or May 1999.  On direct
examination by her lawyer, Theresa stated that without telling her doctors, she
took herself off Risperdal, which was part of her treatment for her bipolar
condition, in April or May 1999 because she Awas
having trouble functioning at work, concentrating.  [She] was starting to fall asleep at the
board.@  (Theresa still worked for Royce=s
company at that time and for Royce (or one of his companies) as of the time of trial.)  Theresa testified that Royce agreed that she
was on too much medication.

When
asked how the medicine affected her, she answered,

It
would make me moody.  Sometimes I would
be temperamental.  I couldn=t concentrate all the
time.  If he was trying to tell me
something, I would have to really focus hard at what he was telling me and
trying to listen, because I really want[ed] to hear what he was saying, and it
was so cloudy.

 

Theresa testified that after
she stopped taking Risperdal, she had more depression but fewer mood
swings.  On May 21, 1999, two months
after she and Royce reconciled, they signed another postnuptial agreement, as
did their lawyers.  On cross-examination,
she testified that as of that date, she was still taking Risperdal for
psychotic episodes, that she had some psychotic episodes in May 1999, that she
stopped taking Risperdal shortly after signing the agreement, and that she told
the doctor that she had stopped taking it two weeks later.  When asked on cross-examination whether she
was in the hospital when the May 1999 postnuptial agreement was executed,
Theresa answered that she was not but A[s]hould
have been.@

When
Theresa signed the May 1999 postnuptial agreement, she was seeing Dr.
Villarreal, one of Dr. Grant=s
associates, monthly, or more frequently if she needed it.  She testified,

I
was educating myself about my disease. 
So if ICif I started feeling
tired a lot, mood swings, noticing my temper was short, or I would pay
attention to what Royce was saying or the kids were saying[, M]om, you=re getting snappy, or
[M]om, this or that.  I would become more
alert to what was going on.  And then my
own emotions.  I started feeling feeling
again.  And I started understanding what
I was feeling.  And I knew when I was
depressed.  And I knew when I was
suicidal.  And I knew when a thought
would run through my head.  And I wanted
it to stop.

 

 








She stated that she was
having suicidal thoughts A[s]ometimes several times a
week@
during that time, that she continued to have them A[o]n
and off throughout@ 1999, that she had had them
since 1995, and that she continued to have them at the time of trial.  In September 1999, she began taking
Clonazepam, which she understood would calm her down and eliminate the highs
and lows, or cycling, that she was experiencing.

Beal
testified that she saw Theresa from November 2000 until March 2002, from July
2003 through October 2003, and then again in March 2004 through the day of the
trial on a monthly basis.  Beal explained
that she initially began treating one of Theresa=s
daughters in July 2000 for self-mutilation and drug use.  Beal tried to persuade Theresa to meet with
her over the next four to six months because Abasically
the daughter said [Theresa] was driving her crazy because of her mood swings
and her anger and her disjointed thoughts and just her inability to function.@  Beal finally met with Theresa and Royce in
November 2000 regarding the daughter and later, Theresa alone.  In the initial interview, Beal Acould
tell that [Theresa] was very disjointed.@  Theresa=s
participation in the interview was A[i]llogical
banter.  . . . [Beal] just couldn=t
follow her.  . . . It was very hard for
[Beal] to understand [Theresa].@  Beal was not treating Theresa at that point,
so she could not diagnose her, but  Beal Afelt
like [Theresa] was manic at the time@ and
Alike
she was very disjointed in her thinking.@  Beal explained,

She
wouldn=t finish one sentence
without starting another topic.  She
would jump from one topic to another. 
She interrupted a lot and brought up things way in the past that didn=t have a lot to do
with what we were talking about at the time. 
And talked incessantly, and it was difficult to get her to stop because
it wasn=tCit wasn=t necessarily having
to do with what we talked about.  I found
her very difficult to understand.  She
wasn=t helpful.

 

Beal
testified that at another session in November,

 

[Theresa]
went on for probably half of the session justCand finally I just
told her that this wasCthat I felt like she
was a major  problem, and that her mental
healthCand I explained to
her she looked manic.  She was not
thinkingCyou know, thinking
clearly, and that she couldn=t finish a sentence
before another one.  

 

Beal
explained why she concluded that Theresa was manic:

 

She
couldn=t sit still.  She was all around the office.  She couldn=t stop talking.  Just on and on and on.  Even when I tried to get her to sit down, she
had trouble.  She kept having to hold her
hands.  When she would sit, she would
shake.  And that=s why she said she
couldn=t sit still.  And her talking, incessant talking without a
lot of clear thought.

 

Beal testified that when she
discussed Theresa with Royce on November 5, 2000,

[He]
referred to [Theresa=s] obsessive
compulsive diagnosis.  Her anxiety being
severe.  That she wasChad been drugging on
speed were in quotes.  Told me about her
past drug use.  That she was in a
treatment center in New Mexico.  That I
needed to teach her boundaries.  That she
had no understanding of appropriate boundaries with people.  That she would get in their face.  That she would interrupt them.  That she would do very inappropriate
things.  

 








He said that Theresa=s constantly telling
him I can=t stand the
abuse.  I can=t take the
abuse.  And he did not know what abuse
she was referring to, felt like she was making that up.  Royce states that wife is very unstable.  I put that in parenthesis.  And then he putCI asked how long, and
he just said forever.  He wanted me to
get herCher meds stabilized
and to get her head straightened out. 
And saidChe saidCI put this in quotes,
she can=t function at
all.  And then I just have out beside it
in quotes, crazy.

 

I asked himChe started telling me
about some meds she had been on, even hormone medicine.  I mean it was justChe just said she was
on tons of medicine.  That it didn=t make sense.  She would go from medicine to medicine, and
not always take it regularly.  I asked
how long she had been on medicine, and he just said forever.

 

He said she hates me calling her crazy.  He said she used to go to both AA and
NA.  He told her she might as well stop;
that she=s too unstable; it=s not helping her;
she didn=t go regularly
enough.  That she was to the point where
he would have to drive her places because she would get lost, and he didn=t want to be taking
her places like that.

 

She read her notes from the
session into the record:

Royce states that wife is very unstable, in
quotes, forever, in quotes, obsessive compulsive, Effexor and Celexa.  He said the medicines she was on or had been
on.  Please get her meds and her head
straightened out.  She can=t function.  And then it=s got at all, and in
quotes later, crazy, just try to change her.

 

And then it says[,] ask Theresa about all of
her psychiatrists.  And then it has a
list of meds.  Hormone medicine, not
detailed meds[;] it just says meds, Effexor, hormone medicine.  Bipolar, question mark, because he didn=t say it like he knew
for sure.  Was she manic, question
mark.  I asked the question how long had
she been with all of these?  And he said
forever, but it sounded like an exaggeration.

 

A lot of this discussion was himCthe two times I saw
him, were exaggeration, negative about her health.  I asked if she had ever been diagnosed?  He said yes, but he didn=t know the
diagnosis.  And the only other thing it
says is she hates me calling her crazy.

 

Royce
denied telling Beal that Theresa could not function at all and was crazy and
denied telling Beal to get Theresa=s
medicine and head straightened out.  He
also denied calling Theresa crazy.

Theresa=s attorney questioned Beal further about her
notes about Royce:

 

Q.      Down at the bottom under where she hates
him calling her crazy, there=s some quotes.  And what does this say?

 

A.      It=s about her going to the AA and NA
meetings.  He said she used to go.  And he was just saying he told her to stop
because she=s too unstable.  She was havingChe didn=t want to have to
drive her.  He didn=t want to go.  I can=t.  I
don=t want to.  He thought she should stop.  SoC 

 

. . . .

 

Q.      Okay. 
And what plans did he say, though, he had to deal with; starting with
outbursts?

 

A.      Okay. 
Her problems.  Outbursts,
forgetfulness, inability to process, mood swings, raging.  . . .

Beal
testified that she agreed with Royce that Theresa was very unstable and very
hard to deal with.  Beal also testified
that Theresa was severely ill.

Initially,
Theresa told Beal that she had been hospitalized three times in the past, had
attempted suicide, and had been prescribed lots of medicine, but it was unclear
to Beal what medicines Theresa was taking at that point and what her diagnoses
were.  Theresa told her that she was
taking Haldol, which Beal testified is a very strong antipsychotic drug, and
Risperdal, which Beal testified was another antipsychotic drug, and that she
had been taking them a long time.  Beal
was concerned because usually the two antipsychotics are not prescribed
simultaneously and also because Theresa did not realize that they were
antipsychotic drugs.  Beal diagnosed
Theresa with Bipolar I, which Beal testified is the severest form of the
disorder, anxiety-induced anorexia, and obsessive compulsive disorder.  Beal read from her notes:

My
initial diagnosis of Theresa Sanders at this time, this is in the initial from
seeing her, number one, bipolar disorder I; most recent episode, manic; severe
without psychotic features.  Two, ADHD
inattentive type, with no hyperactivity. 
Three, post‑traumatic stress disorder.  Four, Obsessive Compulsive Disorder and
possible anorexia nervosa caused from the bipolar and anxiety.  . . . 

 

I consider Ms. Sanders unable at that time
when she wasCI was seeing her to
make any well thought out decisions logical or otherwise.  Her thoughts were disjointed, as I found her
unable to complete a thought without jumping to another topic or forgetting her
thoughts in midsentence.  [Theresa=s daughter] stated
her mom had been this way for a long time. 
Ms. Sanders admitted to suicidal thoughts one week prior to our initial
session, and approximately four suicide attempts in the past, and
hospitalizations at Springwood Hospital, Allied Hospital, and in Santa Theresa,
New Mexico.  . . .

 

Beal described Bipolar I:

The main definition is flight of ideas,
grandiose in that you often will think you=re someone that you=re not, or believe
that things are happening that are not happening, disjointed thinking, not
sleeping, or needing sleep for days and days and days, unproductive behavior
repetitively, it=s just unproductive,
incessant talking.

 

There are ten things that qualify for Bipolar
I.  And, mainly, it=s the severity of not
needing sleep and the movement behavior, that anyone that sees her would think
she was not well.

 

Beal referred Theresa to a
psychiatrist, Dr. Minirth, and reviewed his notes:

From
Dr. Minirth=s
initial note, he diagnosed her with ADHD, OCD, hypomanic state at the time she
was in session, and then a dash, bipolar, schizophrenic is what he put, that=s
the way he wrote it.  Having . . . [f]lat
affect.  He just described her behavior,
which is usually what they do when they diagnose anybody with
schizophrenia.  . . . That=s
what he diagnosed her with.

Beal
defined schizophrenia:

 

Schizophrenia
is an isolation and inability to deal with people.  An inability to, what we call, function in
society in a normalCwith a normal
behavior where they can holdCretain thought,
retain memory.  Often they=ll see things or hear
things or be severely paranoid.  I don=t have the diagnosis
in front of me with the details.

 

Beal
testified that she wondered if Theresa was schizophrenic in her first visit
because her mania was so severe and that she found over time that Theresa was
schizophrenic.  Beal also testified that
bipolar disorder is thought to be genetic but that it usually manifests itself
because of trauma or an ongoing stressor. 
She testified that schizophrenia is environmental in that certain trauma
causes the central nervous system to not develop properly.  She testified that schizophrenia and bipolar
disorder both get worse if untreated. 
Beal testified that the sexual abuse that Theresa suffered at the hands
of her father and AUncle Mike@ was
a type of trauma that could lead to schizophrenia.

After
beginning her treatment of Theresa and obtaining further medical history and
records, Beal

considered
her being very unstable for a long time going untreated for a very long
time.  And the reason it got so severe,
in my opinion, was because it was not treated consistently and had been going
on, what seemed for like just from what I got from previous medical records and
history, up to ten years before I saw her.

 

I ordered records because that=s what I=m supposed to
do.  And so it seemed like it had been
going on a long time.  And so I picked up
my treatment with her to stabilize her on both medicine and for all of the
things that she was diagnosed by me and the Minirth Clinic, combined, to work
on each one to make her stable . . . .

 

The medical records Beal
obtained included Alab reports, past
psychiatrists[>]
and counselors[> records], follow-up with
doctors and treatments from surgeries that she had, neurology reports, and
diagnosis from various doctors.@  Beal had psychiatric reports from 1991 to
1995 as well as those from Dr. Minirth. 
The records showed that Theresa was diagnosed with bipolar disorder as
early as 1993, when she was hospitalized after her first suicide attempt.

Theresa=s
trial counsel asked Beal to give an opinion about how long Theresa had been
unable to make decisions:

Q.      My question is:  Based upon your review of the various medical
records, psychiatric information that was provided to you, based upon, in your
interviews or treatment of Ms. Sanders, do you have an opinion as to how long,
from the information you have, that she was unable to make decisions?

 

A.      From the medical records, I would say >93.  From history and talking to her and looking
through everything, myCmedical records [are]
factual.  My opinion, because of the
symptoms and the diagnosis, which resolveCwhich start with abuse or since she was a
child, I don=t factually know
that.  My jobCand I can
diagnose.  That is my job.  I can=t see a client without diagnosing them if it=s a true
illness.  I am a medical
professional.  My job is just to tell you
what I saw from history and then during my time I saw her.  But medically, >93, from the facts.

 

Beal
testified that Theresa had taken antipsychotics, anti-anxiety, and bipolar
medicines.  The antipsychoticsCDepakote,
Zyprexa, Risperdal, and HaldolCwould
help Theresa think clearly and not hallucinate. 
Often, according to Beal, antipsychotics work quickly, within two days
to two weeks.  But the records Beal
ordered showed that Theresa had been on and off them for years; Beal opined
that the frequent usage was to control Theresa=s
manic episodes.  Beal also testified that
people with bipolar disorder are never supposed to stop taking their medicine
and that they Ausually
. . . get psychotic or severely depressed and suicidal@ if
they stop taking their prescribed medicine. 
She explained that if they get psychotic, then they have an inability to
focus or function, have flights of ideas, are manic, do not sleep, and have
more delusions.

Beal
testified that Theresa did not stay on her prescribed medications, as reported
by both Royce and Theresa.  Beal
testified that this circumstance would affect Theresa=s
ability to make rational decisions and was consistent with Beal=s
finding that Theresa was unable to make decisions.

On
cross-examination, Beal testified that she believed that Theresa was competent
on the day of Beal=s testimony and admitted
that she had no personal knowledge of Theresa=s
behavior before they met in November 2000. 
She also contrasted Theresa=s
behavior at trial and her behavior in November 2000.  Beal testified that in her opinion, Theresa
would not have been competent on May 15, 1999, a week before the second
postnuptial agreement was signed, to sign a contract to buy a new car A[b]ecause
for her to be as severe as she was when I met her, I don=t
think she could have been that way a year before.@  Beal explained that A[j]ust
because you=re
bipolar doesn=t
mean you=re
incompetent.  But from the knowledge
[Beal] had of [Theresa] taking her medicine, and especially over the last year
before [Beal] saw her, for her to be that severe, it had to be going on a long
time.@  Beal testified that she did not know whether
Theresa could have balanced a checkbook in 1999 but that she thought not, based
on her observations later in November 2000. 
Beal admitted that she did not Aknow
as a fact@
that Theresa was not in the same mental state on May 15, 1999 as she was that
day at the trial but stated that she could only give her opinion.  Beal also answered, AYes@ to
Royce=s
trial counsel=s
question, AAnd
do you think that she was just out of it each time she got married?@

Beal
testified that she thought that Theresa should have been hospitalized in
November 2000 and on other occasions and had suggested it then if no one would
be able to stay with Theresa.  Beal also
testified that in November 2000, she did not believe that Theresa was competent
to be driving in traffic.  Beal also
testified that by January 2001, she suggested that Theresa not engage in any
business activity.  When asked, AIs
it your position with the court, ma=am,
that prior to your treating this lady inCin
the beginning of November of 2000, that she should not have been held
responsible to the standardCto
any standards prior to that time?@,
Beal answered,

[T]here
are certain things I think she would have been held responsible for.  If she had hurt her children or anything like
that, whether she was bipolar or manic or psychotic or any of that, I think she
should have been held responsible.  Do I
think she was able to make any legal decisions or any banking decisions or
anything like that, I don=t think she would have
known what she was doing very well.

 

 








Beal testified that she did
not believe that Theresa should be held responsible for any legal decision from
the time she became really sick, but she admitted that she did not know exactly
when Theresa became really sick.  Beal
testified that the medical records provided evidence that in May 1999, Theresa
was not at least in the same mental condition she was at trial.  Beal explained that the evidence would be Aan inference
from [Theresa=s]
abilities and the records in >97
and her abilities when [Beal] met her.@

Beal
also testified that Theresa was not on medication in 1999 and that she did not
think that Theresa was treated at all in 1999 because Royce and Theresa both
told her so.  Beal testified that she did
not believe that Theresa was making any healthy decisions in May 1999 and that
Theresa required both medicine and treatment to get better.

Beal
testified that Theresa stopped treatment in March 2002 and that Theresa told
her that it was because of the cost. 
Theresa, who testified that she Astarted
going a lot less@ A[p]robably
in 2001, approximately in March, maybe,@
verified that she stopped seeing Beal because of the expense, which was not
covered by insurance.  Theresa testified
that she went back to see Beal on a few occasions but did not go back more
often because she did not have the money.

Theresa
also began seeing Dr. Minirth in late 2000 and saw him A[a]pproximately
three months for stabilization.@  She testified that her drugs were then
changed to Wellbutrin and Athe
new drugs.@  She admitted that she was again diagnosed as
bipolar.  Theresa stopped seeing Dr.
Minirth A[p]robably
[in] April@
2001 because the visits were not covered by her insurance and were therefore
too expensive.  After Dr. Minirth,
Theresa went back to Dr. Villarreal.  He
subsequently moved.  At the time of
trial, she was seeing another doctor in his office on a monthly basis.

Beal
admitted that she did not Aexactly
know@
what Theresa=s
mental state was between March 2002 and July 2003, but stated that Theresa was Apretty
severe@
when she came back to treatment in 2003.

Royce=s
theme appeared to be that Theresa was lying regarding the effects of her mental
illness on her mental capacity in 1997 and 1999.  On cross-examination, Theresa admitted to
telling Royce soon after they first met that her baby daughter had died, which
was a lie, and also admitted that he had given her money to bury the baby.  Theresa testified that the baby had needed Ato
be invisible.@  After her own counsel objected, and Theresa
continued to testify (which happened continually during this portion of the
trial over the objections of both counsel), Theresa testified, 

I=m sorry. 
I=ve got a problem when
I=m looking at someone,
I can=t see.  I=m focused here right now, and I=m not seeing him when
he stands up.  I hear him, but I don=t see him stand up.

 

. . . .

 

When I=m focusing this way or like this.  When he stand up, it=s like I don=t see him over here
stand up.

 

. . . .

 








I can hear him when he talks.  The same way when I was listening to Mr.
King, I directly look at Mr. King. 
Because if I=m looking at you, I=m concentrating and I=m understanding what
you=re saying.

 

Theresa also testified on
cross-examination that Ait was the same way then [in
1997 and 1999].  I=m just
like this then, but worse, a whole lot worse. 
Ask him.  He knows.@

When
asked whether he believed that Theresa was Aokay,
mentally,@
from 1997 through 1999, Royce answered, AI
don=t
know.  Is she okay now?@  To the follow-up question, AYou
don=t
know?@ he
answered, AI
don=t
know.  No, I don=t
know.@

Initially,
we reject Royce=s argument that Beal=s
testimony is no evidence because it is speculative.  Royce did not object to her testimony at
trial on the basis of her qualifications as an expert, nor did he raise a
pretrial challenge on that basis. 
Further, we note that Beal=s
opinions regarding Theresa were based  on
her review of medical records and her own personal knowledge.  That all the records and eyewitness
observations were not on the same dates that the postnuptial agreements were
signed is of no moment; a factfinder may rely on circumstantial evidence
including Apreexisting
external circumstances tending to produce a special mental condition@ as
well as evidence of Aa mental condition from
which its existence at the time in question may be inferred@ to
determine mental incapacity.[15]

Consequently,
considering all the evidence and applying the appropriate standards of review,
we hold that the evidence is legally and factually sufficient to support the
trial court=s
findings that Theresa involuntarily signed the agreements based on her mental
incapacity and the trial court=s
conclusions that the postnuptial agreements were therefore not
enforceable.  We overrule Royce=s
second issue.

Characterization of the
Property

In
November 1979, more than fifteen years before his marriage to Theresa, Royce
formed Euless Excavating, Inc., a closely held C-corporation.  At the September 2007 trial, he was the sole
owner of all the corporate stock, and he was and had always been the
corporation=s
president.  But he testified that the
corporation had not been in active business for approximately three-and-a-half
to four years.

In
1980, the corporation bought three commercial lots on S. Euless Main Street,
Fort Worth, Texas.  Royce testified that
he paid $90,000 by check through the corporation for the lots.  He further testified that the buildings on
the land were built and paid for before his marriage.  Theresa described the Property:

Well, building A used to be Euless Excavating
and Royce Sanders Trucking, Inc. 
Okay.  And that consisted of two
huge bays and a three‑room office with a bathroom and things like
that.  And then it=s got a hoist and
everything out in the shop.  It=s got a huge
backyard.  A backyard, I mean fenced in
area for the equipment that used to be. 
And it=s rented out now.

 








And then (unintelligible) is next door.  They=ve got a hugeCI think it=s two bay.  And I think most of them are done with like
metal structures around them.  And the
front one is done also in metal.  Now
building D used to be Legend and (unintelligible) is now taking it over,
too.  And that=s a concreteCthat one=s pretty new; 1990, I
would say.  And it=s been kept in
excellent condition.  And the one in
front.  There=s actually four
buildings.  And then he=s fenced in two areas
that used to be car lots.  Well, not
really car lots, but storage for cars.

 

. . . .

 

. . . And it=s got a huge
driveway.

 

In
August 2001, the corporation conveyed the Property to Royce.  The deed, signed by Royce as the president of
the corporation, recites that the Property was conveyed to Royce as his sole
and separate property.  At the time of
the conveyance, Royce was the sole owner and stockholder of the corporation.  He testified that at the time of the
conveyance, the corporation was still doing some work but was going out of
business, and he was looking forward to selling it at some point.

Royce
testified that he did not pay anything to the corporation for the Property and
that no transfer of cash or anything of value was made in exchange for the
Property.  He testified that he discussed
with his accountant the tax advantages of the transaction.  He explained 
that if he sold the Property individually, he could take advantage of
the 15% capital gains tax rate. 
Otherwise, if the corporation sold the Property, then both the
corporation and Royce would have to pay taxes, and Royce would pay taxes at his
normal rate rather than at the more favorable capital gains rate. Royce still
owned the Property at trial.

Note
I to the corporation=s financial statements of
fiscal years ending September 30, 2000, and September 30, 2001, provides,
however, that A[o]n
September 30, 2001, the Company sold its land and buildings to Royce
Sanders.  The sale price was $350,000
which resulted in a gain of $125,943.@  Royce testified that he did not know whether
the corporation reported capital gains on the sale of the Property.  He also testified that since the conveyance,
he had received the rental income for the use of the Property.  Respondent=s
Exhibit 31 includes the couple=s
joint 2006 income tax return, which lists as income the rental income from the
Property as well as dividends from the corporation.  The couple=s joint
income tax returns for tax years 2004 through 2006 also reflect depreciation
deductions for the buildings, but Royce testified,

I
didn=t depreciate
anything.  I=ve got a CPA that
does that.  I don=t.  I don=t look at those books.  I don=t know how. 
I quit at the beginning of the tenth grade.  I couldn=t do it if I wanted to.

 

The corporation=s
2005 income tax return reflects rental expense for the rent paid by the
corporation to Royce.

Bryan
Rice, a forensic accountant appointed by the court, testified that other than
the corporation=s tax return and financial
statements for the year of the transaction, none of the financial records he
received from the parties, which were incomplete, showed that the corporation
had received money in exchange for the Property, that Royce had paid the
corporation money for the Property, or that Royce signed a promissory note in
exchange for the Property.  Specifically,
Rice admitted that he and his associates had Abeen
provided with a great many bank statements and a great deal of information@Cmore
than fifteen Bankers Boxes of documentsCbut
stated that a lot of bank statements were missing.  Rice stated that he had reviewed documents
pertaining to the conveyance of the Property from the corporation to
Royce.  Rice admitted that he had not
seen where Royce had paid cash, written a check, or signed a promissory note in
exchange for the Property, nor had he seen an influx of cash in that amount on
the corporation=s ledgers.  But Rice pointed out that the corporation=s
tax return noted that there was a sale of land for $236,600 and a sale of
improved property for $113,400.  He also
testified that the corporation recognized the gain on its income tax return.  While Rice admitted that there was no
evidence that any cash was paid or any note was given, he stated that the tax
return was evidence that a transaction had occurred.

Rice
also explained that he thought that avoiding potential double taxation was the
main benefit of the transaction:

If youCif you look at the totality of the situation,
here=s what I think the
benefit was:  I think the benefit of
having this property on their 1040 was that the net rental income would be
subject to tax on the 1040.  If the
property stayed in the corporation, it would have beenCthe net rental income
would have been subject to tax at the corporate level.  And if that net rental income would have ever
been pushed out to Mr. and Ms. Sanders as a dividend, it would have been
taxable again to them.

 

Theresa
testified that early in 2001, Royce had discussed his plan to Abuy
the [Property], draw the rent, retire, [and] draw his Social Security.@  She testified that she knew that the Property
was deeded to Royce.  She also testified
that she believed the property was worth $1.7 million.

Theresa
challenges the trial court=s
findings that the corporation sold the Property to Royce as his sole and
separate property, that community property funds were not used to purchase the
Property, that the transaction was completed for tax purposes upon the advice
of a CPA, and that no funds exchanged hands, and she also challenges the trial
court=s
conclusion that the Property is Royce=s
separate property.  She contends that the
findings and the conclusion are not supported by the record.  

Property
owned by either spouse at the dissolution of the marriage is presumed to be
community.[16]  However, the community presumption is
defeated by evidence that a spouse received property by deed reciting that the
property was conveyed as the spouse=s
sole and separate property, and the property is then presumed to be separate.[17]  Thereafter, the spouse contending that the
property is community property has the burden to defeat the separate property
presumption.[18]  Additionally, separate property that merely
undergoes mutations or changes in form remains separate property.[19]

The
recital in the deed that the corporation conveyed the Property to Royce as his
sole and separate property displaced the community presumption and created a
new, rebuttable presumption that the Property is Royce=s
separate property.[20]  Rice=s
testimony that the corporation recognized the gain after the transaction,
Theresa=s
testimony that Royce had discussed Abuying@ the
Property from his corporation, and the note appended to the corporation=s
financial statements indicating that a sale had occurred, as well as the
evidence that Royce did not pay the nominal consideration of ten dollars
recited in the deed, did not defeat the presumption that the Property is Royce=s
separate property, in light of the deed recital and the evidence that Royce did
not pay anything of value to his corporation or sign a promissory note for the
Property, that the transaction was completed for tax reasons on the advice of
his accountant, and, significantly, that Royce wholly owned the corporation
(and therefore ultimately, the Property) at the time of the conveyance as well
as at the time of the divorce.[21]  We note that the Property=s
becoming Royce=s
direct asset rather than his asset indirectly as an asset of his wholly owned
corporation is a mere mutation of form that, under these facts, does not affect
the Property=s
characterization.[22]

Accordingly,
we hold that the evidence is legally and factually sufficient to support the
trial court=s
findings that the corporation sold the Property to Royce as his sole and
separate property, that community property funds were not used to purchase the
Property, that the transaction was completed for tax purposes upon the advice
of a CPA, and that no funds exchanged hands, and we hold that the evidence is
legally and factually sufficient to support the trial court=s
conclusion that the Property is Royce=s
separate property.

Theresa=s
further complaints about the trial court=s
finding and conclusion that she is entitled to a disproportionate award of the
community estate and the conclusion that the trial court made a just and right
division of the community estate rest solely on her argument that the Property
is community.  Because we have already
held that the trial court properly concluded that the Property is Royce=s
separate property, we also reject these complaints.  We overrule Theresa=s
issue.

Conclusion

Having
overruled Royce and Theresa=s
issues, we affirm the trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

GARDNER,
J. concurs and dissents without opinion.

WALKER, J. concurs without
opinion.

DELIVERED:  October 14, 2010











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. ' 4.105(a), (c)
(Vernon 2006).





[3]See Sheshunoff v.
Sheshunoff,
172 S.W.3d 686, 695B98 (Tex.  App.CAustin 2005, pet. denied); see also
Tex. Fam. Code Ann. '  4.105.





[4]In re Morgan Stanley
& Co.,
293 S.W.3d 186, 187 (Tex. 2009) (orig. proceeding).





[5]Anderson v. City of
Seven Points,
806 S.W.2d 791, 794 (Tex. 1991).





[6]Ortiz v. Jones, 917 S.W.2d 770, 772
(Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).





[7]Uniroyal Goodrich
Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362B63 (1960).





[8]Cent. Ready Mix
Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).





[9]Pool v. Ford Motor
Co.,
715 S.W.2d 629, 635 (Tex. 1986) (op. on reh=g); Garza v. Alviar, 395 S.W.2d 821,
823 (Tex. 1965); In re King=s Estate, 150 Tex. 662, 244 S.W.2d 660, 661
(1951).





[10]Sheshunoff, 172 S.W.3d at 695
(footnote omitted).





[11]Mandell & Wright
v. Thomas,
441 S.W.2d 841, 845 (Tex. 1969); Rowland v. Herren, No. 03-07-00247-CV,
2010 WL 566881, at *2 (Tex. App.CAustin Feb. 19, 2010, no pet.) (mem. op.).





[12]Bach v. Hudson, 596 S.W.2d 673, 676
(Tex. Civ. App.CCorpus Christi 1980,
no writ); Rowland, 2010 WL 566881, at *2.





[13]Fox v. Lewis, 344 S.W.2d 731, 739
(Tex. Civ. App.CAustin 1961, writ ref=d n.r.e.); see
Bank of Commerce v. Barton, 605 S.W.2d 638, 639 (Tex. Civ. App.CFort Worth 1980, writ
dism=d).





[14]Decker v. Decker, 192 S.W.3d 648, 652
(Tex. App.CFort Worth 2006, no
pet.); Estate of Riggins, 937 S.W.2d 11, 19 (Tex. App.CAmarillo 1996, writ
denied).





[15]Bach, 596 S.W.2d at 676; Rowland,
2010 WL 566881, at *2.





[16]Tex. Fam. Code Ann. ' 3.003(a) (Vernon
2006); Todd v. Todd, 173 S.W.3d 126, 127 (Tex. App.CFort Worth 2005, pet.
denied).





[17]Kyles v. Kyles, 832 S.W.2d 194, 196
(Tex. App.CBeaumont 1992, no
writ) (citing Hodge v. Ellis, 154 Tex. 341, 277 S.W.2d 900, 904 (Tex.
1955)).





[18]Id.





[19]Legrand‑Brock
v. Brock,
246 S.W.3d 318, 321 (Tex. App.CBeaumont 2008, pet.
denied); Harris v. Harris, 765 S.W.2d 798, 802 (Tex. App.CHouston [14th Dist.]
1989, writ denied).





[20]See Kyles, 832 S.W.2d at 196.





[21]See Fazakerly v.
Fazakerly,
996 S.W.2d 260, 266B67 (Tex. App.CEastland 1999, pet.
denied) (holding that wife overcame community presumption regarding leasing
companies formed during marriage when evidence showed that she but not husband
was named on stock certificates of the leasing companies and that they were
formed to shield her separate property companies from liability, and no
evidence showed that $1,000 payment was made from community funds).





[22]See Legrand‑Brock, 246 S.W.3d at 321; Harris,
765 S.W.2d at 802.