In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00156-CV
_____

SYLVIA YVONNE STANKEWICH, Appellant

V.

DENNIS JOSEPH STANKEWICH, Appellee

On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 22-07-08460-CV

MEMORANDUM OPINION

Sylvia Yvonne Stankewich ("Sylvia") petitioned to divorce Dennis Joseph

Stankewich ("Dennis") and appeals the trial court's Final Decree of Divorce.[1] In one

issue, Sylvia complains the trial court erred by finding the parties' post-marital

---

[1]For purposes of clarity, we refer to the parties by their first names.

1

agreement is invalid and unenforceable. As discussed below, we affirm the trial court's judgment.

## BACKGROUND AND PROCEDURAL POSTURE

On March 26, 2011, Sylvia and Dennis married. They had a tumultuous marriage, involving allegations of domestic abuse by both parties, and multiple protective orders were issued by various courts during the marriage. Sylvia previously petitioned for divorce, which she nonsuited or dismissed, before filing the petition that culminated in this appeal.

On July 1, 2022, Sylvia filed her Original Petition for Divorce in this matter. Sylvia sought to enforce what she claimed was a postnuptial agreement executed by the parties on April 9, 2018 (the "Agreement"). In July 2022, Dennis filed his Original Counterpetition for Divorce. The same day, he also filed Respondent's Original Answer and pleaded the affirmative defense of fraud. In September 2022, Dennis filed his First Amended Counterpetition for Divorce, in which he alleges, among other things, that Sylvia was guilty of "cruel treatment," "committed adultery," and "committed fraud on the community estate" such that he should receive a disproportionate award of the community estate.

The case was tried to the bench. The central issue at trial was whether the parties' Agreement would be enforced. The trial court requested that the parties

2

submit trial briefs regarding the Agreement's enforceability. The trial court told the parties that the first hurdle was "whether we have a valid postnuptial agreement[,]" and he wanted them to file briefs, instructing that Sylvia brief why it is an enforceable contract and Dennis brief why it is unenforceable. The parties submitted the requested trial briefs.

At trial, Sylvia argued the Agreement should be enforced. Dennis argued, among other things, the agreement was unenforceable under either Texas Family Code section 4.105 because (1) he signed it involuntarily, (2) it was unconscionable, and (3) there was not a fair and reasonable disclosure of Sylvia's property or financial obligations, and he failed to waive the disclosure requirement. The trial court told the parties it was "finding that the document entitled Post-nuptial Agreement dated April 9th of 201[8] is unenforceable." The trial court did not explain why the Agreement was unenforceable. The trial court also found that Dennis's social security benefits, VA benefits, disability benefits, and DFAS retirement were his separate property. It also found that a portion of the Alaska pension was Dennis's separate property, but the trial court awarded Sylvia seventy percent of the community portion of that pension.

# TRIAL EVIDENCE[2]

**The Agreement**

A copy of the parties' Agreement was admitted into evidence at trial, although Dennis claimed it was not a true and correct copy, which we address below. The parties executed the Agreement on April 9, 2018. The Agreement states that it is made "in accordance with section 4.100 of the Texas Family Code." It contained a no adultery clause, a non-abuse clause, and a requirement that Dennis attend counseling, and it said if Dennis violated any of those provisions, it constituted grounds for divorce and enforcement of the Agreement. It also contained language that the parties signed it voluntarily after receiving the advice of independent counsel and without coercion, among other things.

In the event of divorce, among other things, the Agreement required Dennis to pay Sylvia $3,500.00 per month plus reimburse her for health and dental insurance for life. On top of the spousal support and insurance, the Agreement gave Sylvia fifty percent of Dennis's various retirement benefits and disability payments, including: (1) Social Security payments; (2) Defense Finance and Accounting Service, military retirement payments; (3) Alaska Public Employee's Retirement payments; and (4) Department of Veterans Affairs ("VA") payments.

---

[2]We limit our discussion to the trial evidence relevant to the enforceability of the Agreement.

4

**Sylvia's Testimony**

Sylvia testified that she and Dennis married in March 2011, but she knew him between five and six years earlier. She moved from Texas to Alaska in December 2010 to live with him and helped him while he underwent cancer treatment. She explained that after he retired, they both wanted to move to Texas, so they began preparing to sell their house. Dennis took out a loan from a friend in the amount of $30,000 to get their home ready to sell. She confirmed that Dennis owed the friend $30,000 for a loan, but when they sold their house, she claimed that Dennis did not want to pay him back. Dennis did not have relatives in Texas, but Sylvia's father lived in Laredo, so they moved to live with her father. When they moved, they lived off Dennis's retirement funds. Once they sold their house and made $69,000, they took $40,000 and paid cash for an RV. They spent the remaining money on traveling.

Sylvia said they also had a Jeep Cherokee, but Dennis did not want to make the payments on it, so it was repossessed when they came to Texas. Sylvia claimed that Dennis was physically and verbally abusive throughout their marriage and she detailed some of the abuse.

According to Sylvia, she and Dennis both managed the finances, and he had access to the bank accounts. She testified that she only knew what was in the USAA

5

bank accounts, because Dennis kept information from her about the other accounts. She also alleged he "cheated" for "many years."

She claimed that after years of "red flags," she sought a referral for an attorney to draft a postnuptial agreement to protect herself. Sylvia said she and Dennis discussed this information before the Agreement, and they decided they did not want a divorce, but to address her concerns, she wanted them to go to counseling, and he agreed. On the morning they signed the Agreement, she said it was a normal day, and she drove. When they arrived at the attorney's office, the attorney gave them each a copy of the Agreement. They both read the document. Sylvia indicated that Dennis negotiated some terms in the document, for example, he wanted to change seventy-five percent of his income to fifty percent, so Sylvia agreed.

Sylvia described the Agreement's terms, including that Dennis agreed to pay her $3,500 in spousal maintenance, which was a negotiated term, and he agreed to reimburse her for medical and dental insurance. She included provisions to address his infidelity and abusive behavior. She said that he agreed to counseling to work on their marriage but never went. She asked the court to enforce the Agreement.

Sylvia stated she had back surgery in 2018, after they executed the Agreement, which required her going to rehabilitation to learn to walk again. She claimed her health issues have worsened, so health insurance is important to her.

6

She said that Dennis violated the Agreement for the first time after her surgery when in 2019 he strangled her. She proceeded to discuss various incidents of domestic violence Dennis committed against her and the protective orders that were issued. After one incident, on July 25, 2022, the trial court issued a protective order. She also knew that Dennis was never convicted for any charges, because she dropped them. Sylvia admitted that she had been charged with felony assault family violence by strangulation within the last two years, but it was because another family member filed false charges he later dismissed, and she had another past charge for domestic violence.

She purchased her vehicle in August, after she filed for divorce and agreed to pay 14.69 percent interest for a total price of $96,278.25. She listed it as a debt incurred during the marriage but did not consult Dennis about purchasing it and agreed it was an unreasonable purchase. She also testified that she has taken out personal and family loans for this litigation but did not provide any documentation.

There were also temporary orders in place while the divorce was pending that split the retirement funds between the parties, but Sylvia claimed that those funds she received were not enough for her to live on. She testified that she needs another surgery. She is seeing a licensed professional counselor to deal with "complex post-traumatic stress disorder" caused by years of abuse and she testified that she cannot

7

work due to her health problems. Consistent with her inventory, she said her monthly expenses were $5,760 and although she received money per the temporary orders, she needed more than $4,900 to live on. The trial court interjected and questioned why if that was the case she just purchased a vehicle that cost $62,000, and she admitted she could have found a cheaper vehicle. Sylvia asked that Dennis pay her attorney's fees under the Agreement.

Sylvia testified that for at least the last five years, all the marital income was derived from Dennis, and she has not worked since 2016. One of her claimed sources of income is Dennis's Social Security of about $2,000 to $2,200 per month. She said that each month, he also receives income from two disability payments specifically awarded to him, which include "veterans' comp" over $2,000 and social security disability between $2,000 and $3,000. Sylvia noted that he also receives a monthly pension from the state of Alaska of $3,100 and an Army retirement of $1,000. She does not receive any retirement funds or disability payments herself, but Dennis was approved for disability benefits. She estimated over $7,000 in net payments were coming in each month for Dennis.

Sylvia did not believe that the trial court should award her part of Dennis's VA disability benefits but felt she should be awarded part of his military retirement benefits. They married in 2011, but Dennis retired from the National Guard in 2015,

8

and she agreed that they were married less than ten years while he was active in the military. She said that Dennis worked for the state of Alaska from 1987 until 2017, so of the twenty-eight years he worked for the state, only six were during the marriage. She believed she should be awarded more than twenty percent of Dennis's pension from the state of Alaska.

Sylvia discussed the Agreement, which they executed on April 9, 2018, while living in Laredo. She denied they were experiencing any more marital problems than usual during this time. Sylvia denied that she met with an attorney and that the Agreement was already prepared before Dennis went to the attorney's office. She immediately contradicted this by saying it was drafted beforehand and that she consulted the attorney and relayed her concerns about wanting to be protected in the event of divorce. Sylvia denied tricking Dennis into getting in the car with her the day she took him to sign the Agreement under the guise of getting a kitten. She paid to have the Agreement drafted from her "portion of the money."

Sylvia testified that in 2018, from all sources of income, they received less than they are currently, yet the Agreement says that Dennis would pay her $3,500 per month for life. The Agreement also says that he would reimburse her for health and dental insurance, which she says would cost about $860 per month based on her research. The Agreement provides that Sylvia would receive seventy-five percent of

Dennis's survivor benefit from his state of Alaska retirement plus fifty percent of the following: (1) his social security retirement benefit; (2) his Army/DFAS retirement benefit; (3) his "VA comp;" and (4) fifty percent of his state of Alaska retirement pension. She testified her share of all the retirement benefits would be in addition to the $3,500 in monthly spousal support. Sylvia said, however, that the total amount of income from all Dennis's benefits is about $8,000, and half of that would be $4,000. Under the Agreement, though, the total amount Sylvia claims Dennis should pay would be $8,360 per month. She added that the amount he would have to pay her in spousal maintenance and insurance of $4,300 per month would exceed the $4,000 he would receive from fifty percent of the income he received. She testified that it looked like the Agreement solely benefitted her and could not identify anything benefitting Dennis. Yet, she disagreed that there were things solely benefitting her that she would not otherwise be entitled to in a normal divorce.

Sylvia believes that Dennis has psychological problems but did not feel they would keep him from working. Dennis is sixty-six, and Sylvia is fifty-two. She has not applied for disability recently but was previously rejected. She claims she applied for a job approximately two months before trial but has not completed her resumé due to medical appointments.

The Agreement was executed after the date of their marriage. She did not receive any sum of money on April 9, 2018, yet she was asking to enforce the document as a "postnuptial agreement." Sylvia received nothing from the Agreement immediately, but it applied upon divorce. She did not know if Dennis would have any money to live on if the trial court enforced the Agreement and did not know if the payments she would receive under the Agreement exceeded his monthly income. One reason she created the Agreement was the hope he would not abuse her.

**Dennis's Testimony**

Dennis testified that in 2006, he met Sylvia online, and they began communicating. She moved in with him in December 2010, while he underwent cancer treatment, which she helped him through. They married in March 2011 and lived in Alaska until 2017. In 2017, they moved from Alaska to Laredo, Texas, and they lived with Sylvia's father, so she could help take care of him after her mother died.

Dennis explained that while in Laredo, Sylvia kicked him out of the house, and he had to stay in his car, which was ultimately repossessed, so he stayed in a hotel for several nights. After a few days, Sylvia told him he could come home. Shortly after he came home, he thought they were going to get a new kitten, but

11

Sylvia took him to her lawyer's office, where she presented him with the Agreement. Dennis said that after reading over it, he initially refused to sign it.

When he refused, Sylvia told him she was kicking him out of the house unless he signed it. Dennis explained that he had nowhere to go in Laredo, he knew no one, and he was "[b]asically, getting kicked out in the street." Dennis claimed that he "signed it under duress," so he could "go home and make plans[]" to return to Alaska. He stated that he had written a friend about helping him leave Laredo and return to Alaska, but Sylvia intercepted the letter. Dennis said, "She didn't want me to leave because once I leave, she loses control of my money." He explained that he hoped to get money from his friend to leave, but Sylvia destroyed the letter. He could have refused to sign it but would have to live on the streets.

Dennis was asked about the provisions in the Agreement, like the spousal maintenance and health insurance, and he said he knew that the Agreement had that provision, but he only agreed to it "under duress." Dennis testified that Sylvia controlled his bank accounts. Although he had one separate account where his "school money" was deposited, he was having to pay bills with those funds and repay a friend, because their bills were not being taken care of. He also said that they had a joint account where funds were supposed to be deposited, but he did not know whether his debit card worked, although he never checked. He noted the funds that

12

were supposed to be there never were, and they were "always in a hole" because "[s]he spent all the money." Dennis denied that she spent the money on bills and testified he could not take her off their joint account. He explained that Sylvia opened an account that he could not access, and she transferred funds from their joint account into her separate account. He asserted Sylvia made him close his separate Bank of America account with his school money, because she did not want him repaying his friend for the $30,000 loan his friend gave them.

Dennis later testified that he did not read the whole agreement, because when he saw the details, he refused to sign it, so she told him he could not come back to the house. At that point, he told the lawyer and the notary he was "signing this under duress." When asked about the Agreement's abuse and no adultery provisions, Dennis responded that Sylvia started all the physical, emotional, and psychological altercations. He also claimed that on the original document he signed that he circled "under duress," but the exhibit presented to the court had that removed. Dennis also denied that Sylvia initially requested seventy-five percent of his various retirement accounts and that he negotiated a fifty percent split.

Dennis's state of Alaska pension is about $3,500 per month. He worked for the state of Alaska from 1989 until 2017, for over twenty-eight years, yet he was only married to Sylvia for six of those years. He also receives about $900 per month

13

from his military retirement and served from 1974 until 1976, then again from 1994 until 2015; he was only in the military while married to Sylvia for four years. He also receives "VA compensation" of $2,044 per month for injuries related to a disability in the course of duty. Dennis receives $1,814 per month in social security, but it is currently being paid to Sylvia. Dennis asked that the trial court award him 100 percent of the following as his separate property: (1) his VA disability; (2) military retirement; and (3) social security. He agreed that Sylvia was entitled to a portion of his State of Alaska pension for the years they were married, which was about twenty-one percent of his total employment.

Dennis had never been convicted of assault family violence in Montgomery County, Texas, yet Sylvia was the alleged victim when he was charged. He alleged that Sylvia was violent towards him during the marriage and described her as the aggressor. He explained that in the June 2022 incident, he hit the wall to get her out of his room, because she came into his room and threatened to kill him in his sleep.

In April 2018, he wanted to end the marriage but did not consult a divorce attorney or tell Sylvia he was leaving, yet she "intercepted" his letter to a friend asking to help, then he "had to sign a postnup or prenup[.]" Regarding the Agreement, Dennis did not know the attorney who drafted it and did not meet with the attorney outside of his wife's presence. On April 9, 2018, he did not intend to

sign a postnuptial agreement and had no prior conversations with Sylvia about it; he planned to go get a kitten. When he signed the Agreement, he had just returned to his father-in-law's house and did not have any relatives within 100 miles except Sylvia and her father, and all his belongings were at her father's house. He had just returned from staying at a hotel for three days that she paid for, but he did not want to be there. The cause of him having to be at the hotel was the letter he wrote to a friend that he wanted to leave. That morning, Sylvia did not tell him anything on the way to the attorney's office.

When they arrived, there was an attorney and a notary there. In the office, Sylvia told him, "You need to sign this or you're not coming back to the house[,]" but she did not tell him what he was signing. Dennis said he took that as a threat that he could not move back in, he did not know anybody in Laredo, had no money at the time, no bank card, and that is why he asked a friend to send him money. She threatened him in the past and made good on those threats, which caused trouble for him. He felt the postnuptial agreement was unnecessary, he "had no idea about it[,]" and did not help draft it. He also said that he "didn't know what a postnup was[.]" Dennis believed the attorney they saw was Sylvia's attorney. Dennis testified he agreed to the Agreement's terms "[u]nder duress[,]" and circled words on the document and noted that he was "signing this under duress[.]" Dennis did not believe

15

the copy of the Agreement admitted into evidence was true and correct, because it did not have the notation that he was signing under duress.

On April 9, 2018, the only thing Dennis knew about his finances was where the funds came from; he did not know the amounts, and Sylvia oversaw the finances. Dennis did not monitor the amounts, because he "trusted her." If they had divorced in April 2018, Dennis would not have been able to pay Sylvia $3,500 plus fifty percent of all his retirement and disability funds. Dennis said, "[T]hat's unconscionable" and would not agree to the figures or draft it up like that. When he signed the document, he was disabled and taking methadone and pain pills for a back injury. Dennis testified that if he did not sign the document, Sylvia was going to kick him out on the street with "just the clothes on my back." He did not believe the trial court should enforce the agreement, and if it did, he said, "I'd be in the hole, and I'd have to go back to work at 66[,]" which he cannot do.

Although he wanted her out of the house when they were in Alaska, he did not file for divorce but did not know why. He explained that after three days in a hotel, he did not leave, because he did not have money to leave, and she was transferring money from his account into her account.

## STANDARD OF REVIEW AND APPLICABLE LAW

Although the trial court orally advised the parties that he was finding the Agreement unenforceable, the record does not contain written findings of fact and conclusions of law nor show any party requested them. Following a bench trial, when the trial court does not issue separate findings of fact and conclusions of law, all facts necessary to support its judgment are implied. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Ramin' Corp. v. Wills*, No. 09-14-00168-CV, 2015 WL 6121602, at *4 (Tex. App.—Beaumont Oct. 15, 2015, no pet.) (mem. op.). We must affirm the judgment if it can be upheld on any legal theory the evidence supports. *See In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984); *Ramin' Corp.*, 2015 WL 6121602, at *4. When the appellate record includes the reporter's and clerk's records, implied findings are not conclusive and may be challenged based on legal and factual sufficiency. *BMC Software Belg.*, 83 S.W.3d at 795; *Ramin' Corp.*, 2015 WL 6121602, at *4. We review the trial court's decision for legal sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a

17

reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827.

When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In a bench trial, the trial court, as factfinder, is the sole judge of the witnesses' credibility and weight of the evidence and is tasked with resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller*, 168 S.W.3d at 819–21; *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004) (citation omitted); *see also Morrell v. Morrell*, No. 09-20-00086-CV, 2022 WL 959943, at *12 (Tex. App.—Beaumont Mar. 31, 2022, pet. denied) (mem. op.). The factfinder may choose to believe one witness over another, and we do not substitute our judgment for the factfinder's. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (discussing in context of a jury trial); *see also Morrell*, 2022 WL 959943, at *12.

When a party challenges the factual sufficiency of the evidence on a finding on which it did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Law. Discipline*, 489 S.W.3d 58, 66 (Tex. App.—

18

Houston [14th Dist.] 2016, no pet.); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). "The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment." *Parham v. Parham*, No. 09-19-00143-CV, 2020 WL 6787412, at *7 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

Spouses may enter into marital property agreements partitioning their existing and future property, which must be in writing and signed by both parties. *See* Tex. Fam. Code Ann. §§ 4.102, 4.104, 4.105. For such an agreement to be unenforceable, a party must prove:

> (1) the party did not sign the agreement voluntarily; or
> (2) the agreement was unconscionable when it was signed and, before execution of the agreement, that party:
>> (A) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>> (B) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>> (C) did not have, or reasonably could not have had, adequate knowledge of the property or financial obligations of the other party.

*Id.* § 4.105(a). The issue of unconscionability is a question of law for the court. *See id.* § 4.105(b); *In re Marriage of Smith*, 115 S.W.3d 126, 135 (Tex. App.—Tyler 2003, pet. denied). "Because disclosure forms the second prong of the test to rebut

the presumption of enforceability, lack of disclosure is material only if the premarital agreement is unconscionable." *Marsh v. Marsh*, 949 S.W.2d 734, 743 (Tex. App.—Houston [14th Dist.] 1997, no writ) (citation omitted); *see* Tex. Fam. Code Ann. § 4.105(a). "The party challenging the enforceability of a marital property agreement bears the burden of proving the agreement was involuntary or unconscionable." *See Izzo v. Izzo*, 2010 WL 1930179, at *4 (Tex. App.—Austin May 14, 2010, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 4.105; *Pletcher v. Goetz*, 9 S.W.3d 442, 445 (Tex. App.—Fort Worth 1999, pet. denied) (op. on reh'g)); *see* Tex. Fam. Code Ann. § 4.105(a).

In our review, we independently evaluate the trial court's findings on the law and address the issue of unconscionability case-by-case, looking to the entire atmosphere in which the agreement was made. *See In re Marriage of Smith*, 115 S.W.3d at 135; *Marsh*, 949 S.W.2d at 739. Given the confidential relationship between spouses, Texas courts have closely scrutinized property agreements made by spouses during marriage and have imposed the same duties of good faith and fair dealing of them as required of partners and other fiduciaries. *See In re Marriage of Smith*, 115 S.W.3d at 135.

Courts have explained,

In determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made,

the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy, and, whether the contract is oppressive or unreasonable.

*Marsh*, 949 S.W.2d at 740 (quoting *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. Civ. App.—Texarkana 1975, no writ)). The term "unconscionable" has no precise legal definition. *See id.* at 739–40; *see also In re Marriage of Smith*, 115 S.W.3d at 135. Generally, "unconscionable" describes a contract that is unfair due to "overall one-sidedness or the gross one-sidedness of its terms." *In re Marriage of Smith*, 115 S.W.3d at 135 (citation omitted). We will not protect "a party who knowingly enters a lawful but improvident contract...[.]" *Wade*, 524 S.W.2d at 86. "[T]he fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily." *Id.*

"Voluntarily" executing an agreement under section 4.105 is "intentional" and the "product of the exercise of free will." *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 695 (Tex. App.—Austin 2005, pet. denied). Whether a party executed an agreement voluntarily is a fact question that depends on all the circumstances and the mental effect on the party claiming involuntariness. *Martin v. Martin*, 287 S.W.3d 260, 263 (Tex. App.—Dallas 2009, pet. denied). "'[T]he presence of such factors as fraud, duress, and undue influence may bear upon the inquiry' of whether a partition and exchange agreement was involuntarily executed, but they are neither necessary nor

21

always sufficient to establish involuntary execution." *Myers v. Myers*, No. 03-05-00231-CV, 2006 WL 3523792, at \*2 (Tex. App.—Austin Dec. 8, 2006, no pet.) (mem. op.) (citing *Sheshunoff,* 172 S.W.3d at 697). Rather, we consider evidence of those common-law defenses as they relate "to the controlling issue of whether the party resisting enforcement executed the agreement voluntarily." *Id.* (citation omitted).

## ANALYSIS

In a single issue, Sylvia complains the trial court erred "by finding the parties' post-marital agreement invalid and unenforceable."

We first address two preliminary matters. First, Sylvia notes in her brief that Dennis failed to plead the affirmative defense of involuntariness or unconscionability. *See* Tex. R. Civ. P. 94 (requiring certain defenses to be affirmatively pleaded). To the extent that she argues this was an issue not before the trial court, we disagree. The central issue at the trial was the enforceability of the parties' agreement. Sylvia did not object to Dennis's testimony about duress, unconscionability, the Agreement's enforceability, or to the trial court's request for briefing on the issue of the Agreement's enforceability. Indeed, she did not raise this at all in the trial court. Thus, the issue was tried by consent. *See* Tex. R. Civ. P. 67; *Sw. Resol. Corp. v. Watson*, 964 S.W.2d 262, 264 (Tex. 1997) (concluding same in

22

context of a jury trial where no objections were raised to testimony relevant to the issues or when issues were submitted to the jury).

The second preliminary matter is whether the Agreement meets the requirements of section 4.102 of the Texas Family Code, as in response, Dennis contends it did not, but even if it did, he met his burden of establishing affirmative defenses. For purposes of the following analysis, we assume without deciding that the Agreement does so and turn to the affirmative defenses raised.

**Involuntariness**

The parties gave competing accounts of the Agreement's execution with Dennis testifying that Sylvia essentially tricked him into going to the attorney's office, although she disputed this. Dennis agreed that he signed the Agreement but claimed that he did so "under duress" since Sylvia threatened to kick him out of the house without access to any money, he knew no one in Laredo, and she interfered with his attempt to leave the marriage and return to Alaska by intercepting his mail asking a friend for help. He also offered testimony that Sylvia took money from their joint accounts and transferring it into her sole accounts. The evidence also showed that Dennis was disabled, and he was the sole source of income for the couple.

Even Sylvia testified that he had psychological problems, and Dennis said that when he signed the Agreement, he was taking methadone and pain pills. Dennis

claimed that Sylvia threatened to kill him in his sleep and had been physically and verbally abusive to him. Finally, Dennis testified that when he signed the Agreement, he did so "under duress," noting that on the original document when he signed, and the Agreement admitted in the trial court was not a true and correct copy, because it did not contain his notation.

On the other hand, Sylvia claimed that he had access to the bank accounts and money. She also testified that nothing kept Dennis from working when he signed the Agreement. Sylvia explained that she had the document drafted, although it was to protect her from Dennis's abuse.

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude some evidence supports an implied finding that Dennis executed the Agreement involuntarily. *See City of Keller*, 168 S.W.3d at 822, 827. The trial court was free to weigh the witnesses' credibility and resolve conflicts between Dennis's and Sylvia's testimony, choosing to believe Dennis over Sylvia. *See id.* at 819–21; *Golden Eagle Archery*, 116 S.W.3d at 761; *Garza*, 164 S.W.3d at 625; *see also Morrell*, 2022 WL 959943, at *12. Looking at the circumstances surrounding the Agreement's execution in the light most favorable to the trial court's finding, it shows Sylvia took Dennis to the attorney's office under false pretenses, he was taking methadone and pain medication, he could not access his own money at the

time, Sylvia threatened to keep him out of the home if he did not sign it, she had interception his mail asking for help, and she had previously threatened to kill him. *See Martin*, 287 S.W.3d at 263; *Myers*, 2006 WL 3523792, at *2; *Sheshunoff,* 172 S.W.3d at 697. The trial court could have reasonably concluded the evidence showed Sylvia's undue influence and duress supported Dennis's claim he executed the Agreement involuntarily.

As the party attacking a finding on which she did not have the burden of proof, Sylvia has failed to show that no evidence supports the trial court's finding that Dennis involuntarily executed the Agreement. *See Graham Cent. Station*, 442 S.W.3d at 263. Likewise, examining all the evidence and deferring to the trial court's role as the factfinder, we conclude that the trial court's implied finding that Dennis executed the Agreement involuntarily is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Bennett*, 489 S.W.3d at 66.

**Unconscionability**

The evidence at trial showed that Sylvia consulted an attorney without Dennis regarding drafting the Agreement. Sylvia testified that the total amount of income from all Dennis's benefits is about $8,000, and half of that would be $4,000. The evidence also showed that under the Agreement, Dennis would be required to pay

25

Sylvia $8,360, which exceeded all his monthly income. Even Sylvia did not know if he would have any money to live on if the Agreement were enforced. She testified that it appeared the Agreement solely benefitted her and could not identify anything benefitting Dennis.

The record also showed that Dennis received VA compensation for a disability related to his military service, and he said he was unable to work. Although she claimed to have serious health problems, Sylvia testified that her disability claim was denied. Although Sylvia said that Dennis negotiated certain terms in the Agreement, Dennis disputed that testimony. Regarding a lack of disclosure, Dennis told the trial court that Sylvia controlled their finances, and she was transferring money from their joint account to one he had no access to. He also testified that he had not checked if his debit card worked. Dennis said that funds that were supposed to be there never were, and they were "always in a hole" because "[s]he spent all the money."

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude some evidence supports an implied finding that the Agreement was unconscionable. *See City of Keller*, 168 S.W.3d at 822, 827. The trial court was free to weigh the witnesses' credibility and resolve conflicts between Dennis's and Sylvia's testimony, choosing to believe Dennis over Sylvia. *See id.* at 819–21;

26

*Golden Eagle Archery*, 116 S.W.3d at 761; *Garza*, 164 S.W.3d at 625; *see also Morrell*, 2022 WL 959943, at *12. We address the issue of unconscionability case-by-case, looking to the entire atmosphere in which the agreement was made. *See In re Marriage of Smith*, 115 S.W.3d at 135; *Marsh*, 949 S.W.2d at 739. The trial court could have reasonably concluded the evidence showed the Agreement which would have required Dennis to pay Sylvia an amount that exceeded his entire income was unfair due to "overall one-sidedness or the gross one-sidedness of its terms[,]" and therefore, unconscionable. *see also In re Marriage of Smith*, 115 S.W.3d at 135. (citation omitted). Likewise, as to the second prong of unconscionability, a lack of disclosure, the trial court could have concluded that Dennis did not have a fair and reasonable disclosure of Sylvia's obligations, he did not voluntarily and expressly waive the right to disclosure, and did not have adequate knowledge of Sylvia's property or obligations. *See* Tex. Fam. Code Ann. § 4.105(a).

As the party attacking a finding on which she did not have the burden of proof, Sylvia has failed to show that no evidence supports the trial court's finding that the Agreement was unconscionable. *See Graham Cent. Station*, 442 S.W.3d at 263. Likewise, examining all the evidence and deferring to the trial court's role as the factfinder, we conclude that the trial court's implied finding that the Agreement is unconscionable is not so contrary to the overwhelming weight of the evidence as to

be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Bennett*, 489 S.W.3d at 66.

We conclude the evidence supports the trial court's implied findings that Dennis executed the Agreement involuntarily and the Agreement was unconscionable, and thus unenforceable. Accordingly, we overrule Sylvia's sole issue.

## CONCLUSION

Having overruled Sylvia's sole issue, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on December 27, 2024
Opinion Delivered May 29, 2025

Before Golemon, C.J., Wright and Chambers, JJ.